THE STATE OF OHIO, APPELLEE, *v.* OWENS, APPELLANT.

[Cite as State v. Owens (1975), 51 Ohio App. 2d 132.]

(No. 7491—Decided June 4, 1975.)

*Mr. Stephan M. Gabalac,* for appellee.
*Mr. Marvin A. Shapiro,* for appellant.

VICTOR, P. J. On December 14, 1973, defendant Gus George Owens, the appellant herein, was indicted for murder in the first degree (two counts), pursuant to R. C. 2901.-01; breaking and entering an inhabited dwelling in the night season (five counts), pursuant to R. C. 2907.09; breaking and entering an inhabited dwelling in the daytime (one count), pursuant to R. C. 2907.15; armed robbery (five counts), pursuant to R. C. 2901.13; rape (two counts), pursuant to R. C. 2905.01; assault with intent to rob (one count), pursuant to R. C. 2901.24; assault with intent to rape (three counts), pursuant to R. C. 2901.24; felon possessing a firearm (three counts), pursuant to R. C. 2923.56(A); possessing a firearm while committing certain offenses (ten counts), pursuant to R. C. 2947.30, and shooting with intent to kill (two counts), pursuant to R. C. 2901.23. (The three counts charging a felon in the possession of a firearm were subsequently dismissed following a motion by the prosecutor.)

This indictment stemmed from seven separate incidents which occurred between October 12, 1973, and December 9, 1973. A series of pre-trial preliminary hearings were held concerning defense motions for suppression of

various evidence, severing of counts for purposes of trial, and discovery.

At trial, the court dismissed the count of possessing a firearm while committing a certain offense (count 18), amended one charge (count 16) of assault with intent to rape to read assault with a deadly weapon (R. C. 2901.241), and amended one count (count 27) of armed robbery by changing the name of the victim. At the close of the trial, the jury returned a verdict of guilty as to all charges (30 counts) submitted. Following an unsuccessful attempt to secure a new trial and a judgment of acquittal, defendant was sentenced to two consecutive life terms and an additional term of 80 to 388 years. From the judgment imposing this sentence, defendant brings this appeal.

Defendant offered the following assignments of error:

"1. In denying defendant's motion challenging the array, in that identifiable groups of citizens had been excluded from the jury pool, thereby denying defendant an opportunity for a jury composed of a cross-section of the community.

"2. In refusing severance of the two murder counts of the indictment and allowing trial to proceed on ten charges which in fact constituted sentencing procedures rather than criminal charges.

"3. In refusing to identify to the defense an undisclosed witness prior to her testimony.

"4. In permitting the introduction of physical evidence, State Exhibits No. 1 and No. 2, secured by an improper and illegal search warrant.

"5. By failure to allow defendant his right to compulsory process in not permitting defense to call a subpoenaed witness before overruling a motion to suppress physical evidence.

"6. By permitting an amendment to one count of the indictment after all testimony regarding such charge had been placed in the record.

"7. By not ordering the police authority to identify certain fingerprints obtained at the scene of some of the charges alleged."

In an addendum to his brief, defendant further claims that the trial court erred by imposing on him two consecutive life terms and an additional term of not less than 80 years in violation of R. C. 2929.41(E)(1).

A detailed recitation of the facts upon which the 34 count indictment is based is warranted. We note that, in oral argument before this court, the facts as related herein are not challenged by the defendant and he does not contend that the verdict of the jury is against the manifest weight of the evidence.

On October 12, 1973, at approximately 7:30 A. M., an intruder entered the apartment of Burledeane Stein. Mrs. Stein lived with her three children at 161 Bacher Place, in the city of Akron. Mrs. Stein's eleven year old son, Louis, was the first person in the apartment to be confronted. Louis testified that after he heard a sound like a downstairs window opening, the defendant came into his bedroom and motioned him to be quiet. Mrs. Stein was sleeping downstairs and Louis observed the defendant going through his mother's bedroom drawers. The defendant, who kept a gun pointed at Louis, took seventeen dollars and a tear gas gun from Mrs. Stein's bedroom.

The defendant then went downstairs and confronted Mrs. Stein who had been sleeping on the living room couch. Mrs. Stein tried to call the police but was stopped by the defendant. At this point, Mrs. Stein went into her bathroom and closed the door. The defendant then forced the bathroom door open and attempted to rape her. During part of the rape attempt, the defendant was holding a gun to Mrs. Stein's head. While the defendant and Mrs. Stein were in the bathroom, Louis attempted to kick the door in to help his mother, and his two sisters (9 and 14 years) called the police and attempted to get help from the neighbors. The defendant then came out of the bathroom, walked out the door and left in his car. Mrs. Stein, her son (Louis), and her daughter (Debora) each identified the defendant as the intruder.

Akron Detective Harold Craig testified that, in making his investigation of the break-in at 161 Bacher Place, he

obtained an automobile description and license number of the suspect. This information was traced to the defendant who was confronted by Detective Craig several hours after the incident. Detective Craig recovered Mrs. Stein's tear gas gun on a night stand next to where the defendant was sleeping, and further recovered seventeen dollars from the defendant's person.

On November 23, 1973, an intruder entered the apartment of Deborah Englert, located at 36 South Maple Street, in the city of Akron. Miss Englert stated that sometime between 6 A. M. and 6:30 A. M. she heard a noise and saw someone crouched on the floor beside her bed. Miss Englert was sleeping with her fiance, Robert Newland. Miss Englert said that she had an opportunity to look into the intruder's face for several seconds until the bed covers were thrown over their faces. The intruder, who was identified as the defendant, told Miss Englert and her fiance that he was from out of town, that he was a junkie, and that he wanted money. The defendant also inquired about valuable items and firearms present in the apartment. The defendant further stated, as he proceeded to go through drawers, that he would shoot if anyone moved or looked at him.

The defendant then came over to the bed, put his hand under the covers, and began "feeling around" for jewelry. The defendant next took the engagement ring which Miss Englert was wearing, and then asked her to do him a "favor." Miss Englert testified that she became increasingly scared as the defendant continued to feel around. Miss Englert's jaws were wired shut because of a prior tumor operation, and if she threw up she would be unable to expel the vomit.

The defendant then unfastened his pants, spread one of the victim's legs over the side of the bed, and raped her. After the rape, the defendant told the couple that they had better not call the police because he didn't want to have to shoot them. Before the defendant left, Miss Englert heard the click of a cigarette lighter. While Miss Englert did not own a lighter, Robert Newland owned a silver "Zippo" with a distinctive design carved on each side.

After the defendant had left the Englert apartment,

Miss Englert and Mr. Newland determined that the Zippo lighter, among other things, was missing. It was also observed that a kitchen knife, normally kept in the kitchen, was found lying next to the bed. The kitchen window had also been removed.

Mrs. Carla Forero, a medical assistant, lived with her four year old son at 32 West Street, in the city of Akron. On December 7, 1973, between 12 P. M. and 1 A. M., Mrs. Forero heard some noise in the kitchen area of her apartment, and then saw her bedroom door opened by an intruder. The intruder, whom she identified at trial as the defendant, stood at the bedroom door with an outstretched hand and stated: "Don't make any noise or I'll have to kill you." The defendant then approached Mrs. Forero's bed and turned off the light on the night stand. The defendant then sat on the bed next to this victim and put something hard up against her head and stated: "If you make any noise, I'll have to shoot you." The defendant also threatened Mrs. Forero's little boy.

After the defendant inquired about money, he ordered Mrs. Forero to take off her clothes. The defendant then dropped his pants and proceeded to rape Mrs. Forero. Mrs. Forero testified that during the rape she was so scared that she could not move.

In an affort to pacify the defendant, who appeared to have a cold, Mrs. Forero gave him some cough medicine and a bottle of prescription pills. The prescription bottle belonged to Mrs. Forero's parents, Leonard and Louise Nicholas.

The defendant talked with Mrs. Forero and told her that his name was Robert and that he was from Cleveland. The defendant further told Mrs. Forero that if she did not tell the police he would not hurt her.

The defendant also told Mrs. Forero that he was a junkie and needed money. Mrs. Forero gave him the few dollars that she had in her purse and the defendant eventually left. Mrs. Forero testified that her kitchen window, which was closed when she went to bed, was open after the defendant entered.

Mrs. Forero did not go to work that day and moved

out of her apartment and moved in with her mother. Mrs. Forero did have occasion to return to her apartment on Saturday morning (December 8, 1973) and noticed that a rock had been thrown through the front door glass.

Mrs. Halcie Roth testified that her husband, Earl Roth, left their home for work on December 8, 1973, at approximately 6:45 A. M. Mr. Roth was the president and owner of the Duncan Morriss Company, and his leaving for work routine was the same on this December 8, 1973, as all other Saturday mornings. Mr. Roth arrived at the main post office, to pick up business mail, before 7 A. M. on this particular day, still following his normal Saturday schedule.

On December 8, 1973, James Ruby, the regular auto service attendant of Earl Roth, saw Roth, driving a 1968 white Pontiac, pull into the "Magic Inn" parking lot between 7:30 A. M. and 7:50 A. M. Ruby's service station was located at West and West Market Streets, in the city of Akron, across from the Magic Inn. Mr. Ruby further testified that he saw Earl Roth "about every Saturday morning" at the Magic Inn.

Louis Holepit, an employee of the Magic Inn, testified that Earl Roth regularly came into the Magic Inn on Saturday morning at approximately 7:30 A. M. Mr. Roth always had "one donut, cup of coffee and a Plain Dealer." Mr. Holepit did not see Earl Roth on Saturday, December 8, 1973.

At approximately 7:15 A. M., on December 8, 1973, Mrs. Johnnie Mae Price was walking from her home on West North Street to the Magic Inn to get a paper. Mrs. Price's route to the Magic Inn took her up West Street. As Mrs. Price walked past 32 West Street (apartment of Carla Forero), she noticed a young man standing on the front porch. As Mrs. Price continued to walk toward the Magic Inn, she heard a door slam. While Mrs. Price was approaching the intersection of West and West Market Streets, the man she saw at 32 West Street, and later identified as the defendant, approached her from across the street and asked her for the location of a hotel. As the defendant got close to Mrs. Price, he put a pistol in her chest and walked her

back down West Street. As the defendant continued to walk down the street with the gun still in Mrs. Price's chest, he told her that he had just killed a policeman. At one point, the defendant took twenty dollars from Mrs. Price. Before the defendant left Mrs. Price, he told her that if she called the police he would kill her.

Mrs. Price then made it back to the Magic Inn and called a cab. Mrs. Price, in a very emotional state, waited inside the Magic Inn for the cab. As the cab arrived, Mrs. Price again saw the defendant. At this time, the defendant was running into the parking lot of the Magic Inn.

Mr. Albert Lett, an employee of the Duncan Morriss Company, testified that he arrived for work at approximately 7:45 A. M., on Saturday, December 8, 1973. Mr. Lett further testified that Earl Roth was normally at the Duncan Morriss Company to open the gate when he (Lett) arrived for work. When Roth did not arrive at 8:30 A. M., Mr. Lett went home.

Mrs. Elizabeth Lee, a resident of Division Street, in the city of Akron, first noticed a car, later identified as Roth's Pontiac, sitting in the area of 224 Division Street, at approximately 8:50 A. M., on December 8, 1973.

Sgt. George Bland, a detective for the Akron Police Department, testified that on December 8, 1973, he was assigned to investigate an incident where a body was found in a white Pontiac at 224 Division Street. Division Street intersects West Street and 224 Division Street, 32 West Street (apartment of Carla Forero) and the Magic Inn are all in close proximity. Sgt. Bland observed two puncture wounds on the right side of the dead man's head. One wound was directly above the victim's ear, the other was below the ear lobe. The dead man was identified as Earl Roth. Roth had his wallet in his pocket but it contained no money. No change was found in the victim's pockets but the right front pocket contained nine one dollar bills.

Mrs. Roth had testified earlier that her husband normally carried his one dollar bills separate from his wallet which contained larger denominations of currency. Mrs. Roth had also observed that her husband's wallet, on the

evening of December 7, 1973, appeared to contain currency.

Dr. Charles Fox, a Deputy Summit County Coroner, testified that Earl Roth's death was caused by the gunshot wound of the brain. Dr. Fox further testified that the upper gunshot wound of the temporal area would have either caused instant death or a state of unconsciousness. The lower wound would have absolutely caused immediate death.

During the early morning hours of December 9, 1973, an intruder entered the apartment of Bonnie Hood. Miss Hood was living at 25 West York Street, in the city of Akron, with her two children (2 and 5 years) and her boyfriend, Anthony Horn.

At approximately 4:30 A. M., Miss Hood observed a man standing in her apartment with a gun. The gun was pointed at the children who were also sleeping in the same room. The intruder, later identified as the defendant, told Miss Hood and her boyfriend to put their heads under the covers or he would shoot. The defendant then said that he was a junkie and asked for money. Miss Hood and Horn replied that they did not have any. After allegedly discovering that Horn and Miss Hood were not white, the defendant declared: "I'm sorry, man, I thought you were white." The defendant next told the occupants that they should get their back door fixed and then he left.

As part of her identification process, Miss Hood testified that the defendant had also broken into her apartment earlier that year in May (1973). In describing the May incident, Miss Hood testified that she got out of bed when she heard a window break at approximately 6 A. M. During the May incident, Miss Hood and her two children were staying alone. By the time Miss Hood got up, the defendant had already obtained a kitchen knife.

At this point (during the May incident), the defendant instructed Miss Hood to put her children back in bed. The youngest boy refused to go back into the bedroom. Miss Hood told the defendant that she only had eight dollars and the defendant did not take the money. The defendant then told Miss Hood that if she did not have some "sex" that he would shot the smallest boy.

Miss Hood and the defendant then had "sex" on the living room floor in front of the youngster. After this episode, the defendant sat on the couch for a while and then left.

On the same morning the defendant entered the apartment of Bonnie Hood (December 9, 1973), an intruder also entered the residence next door. Shirley Stogsdill reported that, on December 9, 1973, she was sleeping with her boyfriend, Clifton Cutlip, and their ten month old baby, in the downstairs bedroom of her parents' house, located at 31 West York Street, in the city of Akron. Between 4:15 A. M. and 4:30 A. M., Miss Stogsdill observed a black male subject, later identified as the defendant, standing by her bed. Miss Stogsdill started to get up when her baby began to cry, but was pushed back on the bed by the defendant and instructed to cover her head. At this point, Clifton Cutlip started to get up and the defendant pulled a gun. The defendant then picked up the baby and handed her to Miss Stogsdill and next requested ten dollars for a fix.

As the defendant began collecting money, he asked why there were no locks on the doors. The defendant further declared: "You know, anybody can walk in off the streets if you don't have any locks." Miss Stogsdill testified that while all the doors were closed before the defendant entered, they were, in fact, unlocked.

The defendant then began to make sexual advances and Miss Stogsdill asked him to leave since he already had the money and he might wake the people upstairs. The defendant responded: "Well, all those people upstairs, they really like this little baby, don't they?" The defendant then removed some of his clothes and attempted to rape Miss Stogsdill by straddling her and the baby from the edge of the bed. At this point the baby was screaming and the defendant was unable to consummate the rape because he could not get an erection. During this rape attempt, Cutlip observed that the defendant was wearing reddish boxer-type underwear.

After this maneuver, the defendant put his clothes on, lit up one of Miss Stogsdill's cigarettes, and began looking

around the house. The defendant discovered a shotgun which he took, then stated he was from Cleveland, and told Miss Stogsdill and Cutlip not to call the police. As the defendant was leaving, he told Cutlip that "if he ever came back around there better he locks on the doors or he'd come in and see why there weren't."

Again on the same morning of the Hood and Stogsdill incidents, an intruder entered an apartment located at 603 East Market Street, in the city of Akron. Thomas Marr testified that at approximately 6 A. M., on December 9, 1973, he responded to a knock on his apartment door. Mr. Marr was sleeping on the living room couch at the time, while his sister, Betty, and her girlfriend were sleeping in one bedroom, and his other sister, Margaret, and her husband, George Wells, were sleeping in the other.

As Marr opened the door, a black man, later identified as the defendant, shoved his way in, turned Marr around, and struck him (Marr) on the back of the head. The defendant then indicated that he needed money for a "fix." After a short struggle with the defendant, Marr knocked on the bedroom door where Margaret and George Wells were sleeping. When Wells opened the door, Marr was shoved into the bedroom. The defendant then ordered Marr and Mr. and Mrs. Wells to lie on the bed and put the pillows over their heads. The defendant then told Mrs. Wells, at gun point, to take off her clothes. As Mrs. Wells began undressing, she told the defendant not to hurt her husband or her brother. The defendant then held the gun to Wells' head and told him to tell his wife to shut up or he would shoot.

At this point, a struggle began and Mrs. Wells ran out of the bedroom. The defendant then shot both Marr and Wells in the head, and subsequently left. Marr was shot in the temple with the missile traveling through the head and lodging in the opposite shoulder. The missile was removed from the left shoulder during emergency surgery. Wells was shot in the nose area, with the missile traveling into his eye. At the time of trial, Wells indicated that the bullet was still in his head, and he had lost the vision in

his eye and that his eye would eventually be removed.

On December 9, 1973, at approximately 9 A. M., the defendant, as he was in the process of eating a chicken dinner at Kippy's restaurant in downtown Akron, was arrested. At the time of his arrest, the defendant was wearing the red underwear that was subsequently identified by Clifton Cutlip.

On Sunday afternoon, December 9, 1973, after conducting line-up and identification procedures with various victims at the Akron Police Department, the Akron officers proceeded to 83 West Glenwood Avenue, the last known address of the defendant, to conduct a court ordered search. From the occupants of 83 West Glenwood Avenue, the officers determined that the defendant had moved, and was currently living with his grandmother at 279 Lods Court. The officers presented their additional information by affidavit to the Akron municipal judge who executed the first search warrant, and a second warrant was issued for 279 Lods Court, incorporating by reference the information of the affidavit and search warrant for 83 West Glenwood Avenue.

Mrs. Gussie Grogans, the defendant's grandmother, told the officers, and so testified at trial, that the defendant was staying with her, and that he was the only person living on the second floor of her house. A .22 caliber pistol was located by the officers in a second floor bedroom at 279 Lods Court.

Ballistics testimony revealed that the pistol found in the defendant's grandmother's house fired one of the two bullets removed from the head of Earl Roth. The other bullet removed from the head of Earl Roth bore the "class characteristics" of the defendant's weapon, but mutilation from the impact prevented an absolute comparison. Ballistics testimony also determined that the bullet removed from the shoulder of Thomas Marr was also fired from the defendant's weapon.

On December 13, 1973, the Akron Police Department, pursuant to a search warrant, again entered the residence at 279 Lods Court. At this time, a Zippo lighter with dis-

tinctive markings, and a prescription bottle of pills issued to Louise Nicholas were recovered from the upstairs area of Gussie Grogan's house. This Zippo lighter was identified by Deborah Englert as the lighter which was taken during the burglary-robbery-rape incident at her apartment. Likewise, Carla Forero identified the prescription bottle of pills, issued to Louise Nicholas, as the bottle she had given to the man who raped her.

This series of crimes culminated in a thirty-four count indictment against the defendant. Since the defendant had been convicted of burglary in the past, the indictment also contained three counts relating to a felon being in possession of a firearm. The court later severed these counts from the indictment.

### Assignment of Error No. 1

The first assignment of error is without merit. This issue has already been considered by this court in *State v. Hunt*, unreported, Ninth Appellate District No. 7174, rendered December 5, 1973. In that case we held that the jury selection procedure in Summit County is constitutional. We reaffirm that judgment here. Juries are selected in this county pursuant to R. C. Chapter 2313. That selection system does not "systematically exclude distinct groups in the community," and the appellant offers no evidence that it does. The fact is that no one is excused from jury duty unless he, or she requests to be excluded and shows that hardship will result if the request is denied.

### Assignment of Error No. 2

The issue in part one of the second assignment of error is whether the two charges of murder should have been severed from the other thirty counts in the indictment.

Criminal Rule 8 provides in part:

"Joinder of Offenses and Defendants.

"(A) Joinder of offenses. Two or more offenses may be charged in the same indictment * * * in a separate count for each offense if the offenses charged * * * are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transac-

tions connected together or constituting parts of a common scheme or plan or are part of a course of criminal conduct."

It is apparent from a reading of the facts that a joinder was proper in that the counts are "based on two or more acts or transactions connected together or constituting parts of a common scheme or plan or are part of a course of criminal conduct."

Owens contends, however, that the joinder of the murder counts with the others is prejudicial to him and, therefore, under Criminal Rule 14 he is entitled to the severance of those counts. Criminal Rule 14, in pertinent part, provides:

"If it appears that a defendant * * * is prejudiced by a joinder of offenses * * * in an indictment * * * or by such joinder for trial together of indictments * * * the court shall order an election of separate trial of counts * * * or provide such other relief as justice requires."

Criminal Rule 14 is a copy of its federal counterpart, excepting that, while the federal courts have discretion in granting severance, our rule provides that if prejudice is shown "the court shall order" severance. Nevertheless, the construction of Fed. R. Crim. P. 14 by the federal courts is of help in this case.

Those federal cases hold that the defendant must make an affirmative demonstration that his right to a fair trial has been prejudiced by the joinder. *Fisher* v. *United States* (C. A. 8, 1963), 324 F. 2d 775, *cert. denied* 377 U. S. 999; *United States* v. *Gimelstob* (C. A. 3, 1973), 475 F. 2d 157, *cert. denied* in 414 U. S. 828. The defendant has failed to meet this burden. In view of the overwhelming evidence of guilt, the failure to sever the counts has not prejudiced the defendant. *Harrington* v. *California* (1969), 395 U. S. 250.

Furthermore, under R. C. 2945.59 (the other acts statute) as it has been interpreted in *State* v. *Flonnory* (1972), 31 Ohio St. 2d 124, it is our judgment that the same evidence introduced in this multi-count trial would have been admissible on the separate trial for murder. Some of the incidents concerning other crimes occurred shortly before

the murder and some occurred thereafter and four of those incidents occurred within a period of from 30 to 35 hours of the murder. All of the incidents concerned robbery with a hand gun. The robbery murder victim (Roth) was shot in the head, as were two other male robbery victims, and the same weapon was used in all three shootings. As this evidence would have been admissible in a separate murder trial to show a course of criminal conduct involving a common scheme, or plan, as well as the identity of the criminal, we find no prejudice to the defendant. See also, *State* v. *Minneker* (1971), 27 Ohio St. 2d 155.

Moreover, the motion to sever was made before trial. It was not renewed either after the state rested or at the conclusion of all of the evidence. When not renewed, it is waived. *United States* v. *Porter* (C. A. 8, 1971), 441 F. 2d 1204; *Nassif* v. *United States* (C. A. 8, 1967), 370 F. 2d 147; *Williamson* v. *United States* (C. A. 9, 1962), 310 F. 2d 192; *Finnegan* v. *United States* (C. A. 8, 1953), 204 F. 2d 105, *cert. denied* in 346 U. S. 821.

### Assignment of Error No. 3

The defendant contends that when the prosecutor refuses to disclose the name of a state's witness pursuant to Criminal Rule 16(B)(1)(e), he must provide some permanent record for his reasons so that the decision can be subjected to review.

The rule requires that upon the motion of the defendant, the prosecution shall furnish to the defendant a written list of the state's witnesses. The rule further provides:

"Names and addresses of witnesses shall not be subject to disclosure if the prosecuting attorney certifies to the court that to do so may subject the witness or others to physical or substantial harm or coercion."

The defendant requested a list of state's witnesses and the prosecutor stated:

"Undisclosed witness pursuant to Rule 16(B)(1)(e). The State certifies that disclosure would subject this witness to potential physical harm and coercion."

During a pre-trial hearing, the defense questioned the prosecutor's reasons for not disclosing this witness. They

stated they were aware of a potential witness whose name was not on the list but saw no reason not to disclose her name since the defendant, while in jail, posed no threat to any potential witness.

The trial court then held an eight minute in-camera hearing with the prosecutor only. No record was made of this hearing. At its conclusion, the trial judge stated, from the bench, that he agreed with the prosecutor. Defense counsel then stated that they believed the undisclosed witness was named Price and that her testimony would relate to placing the defendant at the scene of the crime. Counsel were right in this assumption. Price was the witness and when called as a witness, she testified exactly as the defense said she would. Hence, we find that the defendant was not prejudiced and any error was harmless beyond a reasonable doubt. *Chapman* v. *California* (1967), 386 U. S. 18.

We find no error in holding such an in-camera hearing with only the prosecutor present. We do declare, however, that the failure to hold such a hearing "on the record" is erroneous as it precludes the issue from being properly reviewed on appeal. See, Criminal Rule 16(E)(1) and ABA Standards, Discovery and Procedure before Trial, Section 4.6 (1970). Under the circumstances of this case, however, the error is not prejudicial. We reject assignment of error No. 3.

### Assignment of Error No. 4

After the defendant had been arrested, the police properly secured a search warrant from the Akron Municipal Court. The warrant was issued for 83 West Glenwood Avenue, the last known address of the defendant. The defendant no longer resided here, and a second warrant was issued for the correct address within two hours of the issuance of the first.

The second warrant was executed upon a second affidavit which incorporated, by reference, the affidavit upon which the first warrant was issued. A copy of the first affidavit was attached to the second affidavit and together they established sufficient probable cause to authorize the issuance of the second warrant.

Criminal Rule 41(C) requires that a search warrant shall issue "only on an affidavit or affidavits sworn to before a judge of a court of record." It specifies the required contents of an affidavit but it does not specify its form. In this case, the first affidavit was attached to the second and sworn to a second time before the same judge who issued the first warrant. Obviously, all the indices of reliability were present and the requirements of the rule were followed. We reject this assignment of error.

### Assignment of Error No. 5

Defendant contends the court erred in refusing to permit the defense to call and examine a witness at a pre-trial hearing relative to the suppression of evidence.

At the hearing, the state presented a police detective who, together with his partner, seized certain articles ($17 and the tear gas gun) when they arrested the defendant. The arrest was made pursuant to an arrest warrant and the search and seizure as an incident thereof. The state then rested and the defendant sought to call the other detective, one Harold Craig, who was then testifying in a murder trial. The defense had subpoenaed Craig, but the court refused to call him when the defense could not say that his testimony would be favorable to the defendant. This action of the court constituted a denial of compulsory process as granted by Section 10, Article I, Ohio Constitution and the Sixth Amendment of the United States Constitution, as applied to the states through the Due Process Clause of the Fourteenth Amendment. *Washington* v. *Texas* (1967), 388 U. S. 14.

The right, however, in the view of some federal courts, is not absolute and defendant must indicate how the production of the witness would benefit his defense. See, *United States* v. *Joyner* (C. A. 5, 1974), 494 F. 2d 501, *cert. denied* in 42 L. Ed. 2d 268; *United States* v. *DeStefano* (C. A. 7, 1973), 476 F. 2d 324.

Furthermore, Craig did testify at trial and specifically addressed the questions left unanswered at the suppression hearing. These answers were in no way beneficial to

the defendant. Hence, the error, if any, was harmless. *Chapman* v. *California, supra.*

### Assignment of Error No. 6

This assignment relates to the amendment of one count of armed robbery by changing the name of the victim. At trial, it became evident that, although the defendant had taken the property of Burledeane Stein, he had taken it while holding her son, Louis Stein, at gunpoint. At the close of the state's case, the court permitted the state to amend the indictment by changing the name of the victim to Louis Stein.

An indictment may be amended before, during or after trial in respect to any defect or omission in form or substance provided no change is made in the name or identity of the crime charged. Criminal Rule 7(D). This rule is identical to R. C. 2941.30, which it presumptively supersedes.

An amendment to an indictment which changes the name of the victim changes neither the name nor the identity of the crime charged. *In re Stewart* (1952), 156 Ohio St. 521; *Dye* v. *Sacks* (C. A. 6, 1960), 279 F. 2d 834. (This case originated in the Ninth Appellate District.) The amendment simply cured a variance between the indictment and the proof. The defendant was not prejudiced thereby. The assignment of error is overruled.

### Assignment of Error No. 7

The record discloses that the court granted the defendant's motion and ordered that an unidentified fingerprint be made available to the defense. The next day, the defense asked for a continuance of trial, or to have the police compare the fingerprint with the prints of two other men. The court correctly denied both requests as unnecessary and groundless. The assignment of error is overruled.

### Addendum Assignment of Error

R. C. 2929.41 provides, in part:

"Multiple sentences. * * *

"(E) Consecutive terms of imprisonment imposed shall not exceed:

"(1) An aggregate minimum term of twenty years,

when the consecutive terms imposed include a term of imprisonment for murder;

"(2) An aggregate minimum term of fifteen years, when the consecutive terms imposed are for felonies other than aggravated murder or murder * * *."

The defendant was convicted of first degree murder which is now called aggravated murder, under the new criminal code, effective January 1, 1974. Since R. C. 2929.-41(E)(1) speaks only of "murder" and not "aggravated murder," we conclude that there is no minimum-maximum term for consecutive multiple sentences when one of the included offenses is aggravated murder (murder in the first degree).

Notwithstanding our interpretation of R. C. 2929.41, the defendant will be eligible for parole after serving a term of fifteen full years. See R. C. 2967.13 (Parole Eligibility). This assignment of error is without merit.

Criminal Rule 33(E) provides, in part:

"(E) Invalid grounds for new trial.

"No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of: * * *

"(5) Any other cause, unless it affirmatively appears from the record that the defendant was prejudiced thereby or was prevented from having a fair trial."

This defendant had a fair trial. He was not prejudiced by any error which might have occurred during the course thereof. The evidence discloses his guilt beyond a reasonable doubt. The judgment entered thereon is neither against the manifest weight of the evidence nor contrary to law. Accordingly, the judgment must be affirmed.

*Judgment affirmed.*

MAHONEY and BRENNEMAN, JJ., concur.