DECISION AND JUDGMENT ENTRY
{¶ 1} John F. Taylor appeals his conviction and sentence for two counts of rape in violation of R.C. 2907.02(A)(2). Taylor argues that, pursuant to the holding in Blakely v. Washington (2004), 542 U.S. ___,124 S.Ct. 2531, the trial court erred when it enhanced his sentences beyond the statutory minimum and ordered him to serve each sentence consecutively. Because we previously interpreted Blakely to not apply to the Ohio sentencing scheme, we disagree. Taylor also contends that the trial court erred by denying his motion to sever the charges. Because we find that Taylor waived this objection by failing to renew his motion either at the close of the State's case or at the conclusion of all of the evidence, we disagree. Finally, Taylor asserts that his conviction is against the manifest weight of the evidence. Because we find that substantial evidence supports the conviction, we disagree. Accordingly, we affirm the judgment of the trial court.
 I. {¶ 2} On January 29, 2004, the Athens County Grand Jury indicted Taylor on two counts of rape in violation of R.C. 2907.02(A)(2), with sexually violent predator specifications. Before trial, Taylor moved to sever the counts. He argued that joinder would prejudice his rights and deprive him of a fair trial. The trial court denied the motion.
 {¶ 3} At trial, the state alleged that Taylor forcibly raped Victim 1, age 19. Specifically, the state presented evidence that Taylor pushed the victim into a bedroom, threatened to pull a knife, and forced her to engage in oral and vaginal intercourse. The state also alleged that Taylor forcibly raped Victim 2, age 16. Specifically, the state argued that Taylor, a family friend, took the child on a test-drive of a car he planned to give her, drove her to a secluded area, took out a knife, and forced her to engage in oral and vaginal intercourse. Taylor admitted to sexual contact with both victims, but argued that he acted with each victim's consent.
 A. Count I: Forcible Rape of Victim 1 {¶ 4} Victim 1 testified that Taylor forcibly raped her in Athens County, on January 12, 2004. Two weeks before the rape, she voluntarily admitted herself into the Rural Women's Recovery Program for heroin addiction. She left the program on January 12, but found herself without a ride home after her parents refused to pick her up. She then met a male college student and his father, with whom she spent the day and who attempted to find her a ride to Xenia, Ohio. The college student and his father drove her to a gas station to meet her ride, which never came. Instead, James Frederick Crosby approached the car, purchased drugs from the father, and then offered to give the victim a ride. She accepted his offer and got into Crosby's vehicle, in which she found Taylor and another woman.
 {¶ 5} The victim, Crosby, Taylor, and the woman drove to a home, where the victim admittedly abused oxycontin. They then went to Crosby's trailer in Nelsonville, Ohio. While in the trailer, Taylor asked the victim to retrieve his wallet from the bathroom. As she walked down the hallway to the bathroom, the victim became nervous, turned around, and found Taylor blocking the hallway with his arms. Taylor asked her to engage in sexual intercourse with him. She refused. Taylor then told her she deserved to be raped and threatened to cut her from her throat to her stomach. Knowing Crosby was in the kitchen, she attempted to scream, but Taylor covered her mouth with his hand.
 {¶ 6} Taylor then grabbed the victim's arms and pushed her into the closest bedroom and onto the bed. Taylor told her he would not hurt her if she complied. He warned her that he had a knife in his back pocket. Taylor commanded that she undress, which she did. Taylor also undressed and engaged in vaginal intercourse with her. He then forced her to perform oral sex on him. The victim testified that the rape occurred over a period of 45 minutes.
 {¶ 7} During the oral penetration, the victim heard Crosby approach the bedroom door and began to inch off the bed. When Crosby opened the door, she jumped from the bed and ran out screaming rape. She left the trailer, naked except for her socks, and ran to the nearest trailer. She knocked so forcefully on a window that she broke the glass. The residents of the trailer let her in, gave her clothing, and called the police. She went to the hospital, consented to a rape kit, and gave a statement to the police.
 {¶ 8} The victim admitted that she never saw the knife and never noticed an outline of a knife in Taylor's back pocket before the rape. However, she testified that, because of his statements to her, she feared he had a knife in his possession and, therefore, complied with his demands. She also admitted that she did not know Taylor before that evening. Finally, the victim testified that she weighed approximately 125-130 pounds, and stood five feet, six inches in height.
 {¶ 9} Nalani Coleman, an emergency room nurse at Doctor's Hospital, treated the victim for rape. Coleman testified to the hospital's rape patient procedure, including the collection of evidence and treatment. In the victim's exam, Coleman found an abrasion on the inner right knee and a bruise on the outer right thigh. However, on cross-examination she admitted that she was unable to conclude with certainty if the bruises occurred two hours earlier or eight hours earlier. She also testified that the victim was distressed, wept, and, in her opinion and experience, acted as a rape victim would. On cross, Coleman testified that she did not find bruising or injury on the victim's arms or face.
 {¶ 10} Jessica Lynn Berry, Crosby's neighbor, testified that she found the victim outside her home on January 12. According to Berry, the victim appeared at her door naked, except for socks. The victim was hysterical and claimed to have been raped at Crosby's trailer. Berry wrapped her in a blanket, and the victim collapsed onto the floor. Berry gave clothing to the victim and called the police.
 {¶ 11} Charles Winchell, Berry's boyfriend, testified that he met the victim when she came to his trailer, seeking shelter and claiming rape. By the time he saw the victim, Berry had already brought her into the home and wrapped her in a blanket. He testified that the victim acted hysterically and that he tried to calm her while Berry called the police. She told him that she was raped at Crosby's trailer.
 {¶ 12} Duane Covert, a police officer for the City of Nelsonville, received a report of a possible rape and drove to the Berry residence. There, he found the victim, noticeably shaken and distraught. The victim gave him Taylor's description, and he and another officer went to the Crosby residence. They found the residence dark and locked. He then transported the victim to the hospital and returned to the crime scene. Covert obtained Taylor's name from Crosby, but was unable to find the suspect that evening.
 {¶ 13} Danny Warren, Taylor's friend, testified that he saw Taylor on January 12, 2004 in Nelsonville, Ohio. Warren's testimony is confusing. On direct examination, Warren stated that he saw Taylor when he was visiting friends, the Glenns, in Nelsonville, Ohio. According to Warren, Taylor arrived at the Glenns' home and asked to hide because he had just raped a girl. Warren then testified that Taylor actually told him that a woman accused him of rape, but Taylor did not confess to the rape. However, on cross-examination, Warren testified that Taylor asked the Glenns to hide him because he had raped a young girl a few days earlier and another woman had accused him of rape that evening. He then clarified his testimony again, stating that Taylor never confessed to rape, but stated that someone accused him of rape.
 {¶ 14} Crosby also testified. According to Crosby, he was at his trailer with Taylor and a girl he could not identify on January 12, 2004. He claimed he left the trailer and went to the Glenns' home. When he left, Taylor, the girl, and two other men were still inside his trailer. He returned to the trailer 45 minutes later and, while walking toward his home, observed a naked girl running down the driveway, screaming. Crosby then gave a statement to Officer Covert. On direct examination, he admitted that he could not testify to whether that statement was accurate because he used many drugs that evening, including cocaine, oxycontin, and marijuana. Finally, on cross-examination, Crosby testified that he could not recall if the girl used oxycontin, but that he remembered her using marijuana and other drugs.
 {¶ 15} Taylor testified in his own defense. He admitted to engaging in sexual intercourse with Victim 1, but claimed that it was consensual. According to Taylor, he and the victim discussed having sex while in Crosby's home and that she voluntarily walked to the bedroom with him. Taylor testified that the victim willingly performed oral sex on him and then initiated vaginal intercourse. Taylor stated that he could not maintain an erection because he was under the influence of drugs. During vaginal intercourse, Taylor lost his erection and the victim again initiated oral sex. During the encounter, Crosby came to the bedroom door several times and at one point Taylor invited him in the room. At that point, the victim jumped from the bed, ran down the hall and outside of the home, screaming rape. In Taylor's opinion, the victim feared that both he and Crosby planned to have sex with her.
 {¶ 16} After the victim left the trailer, Taylor became frightened because he knew that a warrant had been issued for his allegedly raping Victim 2 a week earlier. He went to the Glenns' home, where he found Danny Warren. He relayed the events to the Glenns and Warren and asked them to hide him. When the police came, he hid in the basement and neither the Glenns nor Warren disclosed his presence to the police. Taylor then left the house and hid for a couple of days before turning himself into the police.
 B. Forcible Rape of Victim 2 {¶ 17} Victim 2 testified that Taylor forcibly raped her in Athens County, on January 4, 2004. Taylor, a family friend, offered to give the victim a car and took her on a test drive of that car. When they left her home, the victim was driving the vehicle. Later, Taylor drove the vehicle and took them to a secluded, back road. Taylor stopped the car and asked the victim if she was a virgin. He then left the car to smoke marijuana. When he returned, the victim sat in the driver's seat and Taylor sat in the passenger's seat. Taylor then pulled out a knife, which she described as being approximately eight inches in length, and told her "this is happening."
 {¶ 18} Taylor put the knife to the victim's throat and ordered her to remove her clothing. She refused to undress. Taylor threatened to hurt her and told her not to force him to hurt her. Taylor then placed the knife on the dashboard and began to undress her. At some point, he told her to not fight him. After he undressed her, Taylor removed his pants, grabbed the back of the victim's head, and forced her to perform oral sex on him. Taylor ejaculated outside of her mouth. He then used a sock, from the backseat, to clean himself. Once clean, he picked her up, placed her on top of him, and engaged in vaginal intercourse. Taylor failed to ejaculate. The victim testified that he acted proud and "kept saying that he never had a virgin before." During the entire incident, the knife remained on the dashboard.
 {¶ 19} After the rape, the victim dressed and asked Taylor to take her home. Taylor told her he could not take her home and drove her to a convenience store parking lot, where he allowed her to call her mother from a pay phone. The victim asked her mother to pick her up, but did not tell her about the rape over the phone. She testified that the phone faced the passenger side door, which had a broken window, and she feared telling her mother while Taylor was within earshot. After she called her mother, Taylor left her in the parking lot. The victim did not approach anyone at the store to report the rape. Instead, she waited for her ride and informed her mother when she arrived. Her mother took her to the police station to report the rape.
 {¶ 20} The victim testified that, at the time of the rape, she stood five feet, four inches tall and weighed 101 pounds. She also testified that she did not experience severe pain during the vaginal rape, but did not testify to the physical extent or time-length of the penetration.
 {¶ 21} Nicole Wadsworth, a physician, treated the victim at a local hospital. Wadsworth is board certified in emergency medicine. She testified that the victim complained that she had been sexually assaulted. When Wadsworth first saw the victim in the exam room, she found the child "withdrawn, * * * very quiet * * * and * * * somewhat frightened of me." Wadsworth did not perform the rape kit, but did obtain information about the assault from her support staff, who handle the rape kits. She examined the victim for bruises or other injuries, but did not examine her vaginal area. She found no injuries during her exam. Also, Wadsworth testified that the records do not reveal any trauma to the victim's genitals and that the records indicate that the victim's hymen was still intact. Wadsworth testified that, in her opinion, the victim was raped. On cross-examination, she attributed that opinion to the victim's actions and demeanor, but admitted the victim's demeanor could be attributed to something else. Finally, Wadsworth testified that she never questioned the victim outside the presence of her mother.
 {¶ 22} Anita Brooks is an assistant nurse manager and scene nurse at the local hospital where the victim was treated. A scene nurse acts as a sexual assault nurse examiner. Brooks treated the victim for rape and performed a pelvic examination and rape kit. She found no injuries on the victim, except for a red cervix. However, she testified that a cervix could be red for reasons other than sexual penetration. She also found no injuries to the victim's hymen, but could not testify to whether the hymen was intact because she had no documentation on that particular area. On cross-examination, she advised the court that an intact hymen is not a good indicator of whether a rape occurred. Brooks testified that a hymen might remain intact even though sexual activity occurred. Finally, Brooks testified that if a victim does not struggle, visible injuries are less likely to occur.
 {¶ 23} Taylor admitted to engaging in sexual contact with Victim 2, but claimed it was consensual. According to Taylor, he drove the car to a secluded, cemetery road while taking the victim on a test-drive. He then stopped the vehicle, got out, and used the restroom. He then got back into the car, but into the passenger seat. He and the victim talked for awhile. Taylor then asked if he could see the victim's breasts, she removed her shirt, and they kissed. Taylor contended that the victim willingly performed oral sex on him and climbed on top of him to engage in vaginal intercourse. Taylor testified that when the victim told him she was a virgin he stopped. He offered to take her home, but she refused because she feared she would be in trouble for being out for so long. She asked him to drive her to a pay phone so she could call her mother. Taylor took her to a pay phone, she made the call and told her mother the car got stuck in the mud and that she needed a ride. Taylor then left her at the convenience store. Finally, Taylor denied having a knife with him that day.
 {¶ 24} On cross-examination, Taylor admitted that he vaginally penetrated Victim 2, but claimed that he barely penetrated her. He also testified that, at the time of these encounters, he stood approximately five feet, ten inches tall and weighed 200 pounds. Finally, Taylor argued that Smith is still a virgin because her hymen is intact.
 C. Verdict and Sentencing {¶ 25} The jury returned a guilty verdict on both rape counts, but deadlocked on the sexually violent predator specifications. The trial court dismissed, with prejudice, the sexually violent predator specifications contained in each count. After considering the purposes of sentencing pursuant to R.C. 2929.11, balancing the seriousness and recidivism factors pursuant to R.C. 2929.12, and considering the factors contained in R.C. 2929.13, the trial court sentenced Taylor to the statutory maximum sentence of ten years imprisonment on each count. Further finding that a single term "does not adequately reflect the seriousness of the offense" and that consecutive sentences are necessary pursuant to R.C. 2929.14, the trial court ordered Taylor to serve each sentence consecutively, for a total of twenty years imprisonment.
 {¶ 26} Taylor appeals and asserts the following assignments of error: "I. The trial court erred by sentencing Mr. Taylor to a maximum, consecutive prison terms based on facts not found by the jury or admitted by Mr. Taylor. II. The trial court erred by refusing to grant Mr. Taylor's motion to sever the two counts of the indictment. III. In violation of due process, the guilty verdicts on the rapes were entered against the manifest weight of the evidence."
 II. {¶ 27} In his first assignment of error, Taylor contends that the trial court erred when it imposed terms of incarceration that exceeded the minimum term of incarceration and ordered each term to be served consecutively. Specifically, Taylor asserts that increasing his sentences above the applicable minimum sentence, and ordering those sentences to be served consecutively, based on factual determinations made by the judge, rather than by the jury, violates his Sixth Amendment right to a jury trial under Blakely v. Washington (2004), 542 U.S. ___, 124 S.Ct. 2531.
 {¶ 28} This court has previously held that Blakely does not apply to the Ohio sentencing scheme. State v. Sideris, Athens App. No. 04CA37, 2005-Ohio-1055; State v. Wilson, Washington App. No. 04CA18, 2005-Ohio-830;State v. Wheeler, Washington App. No. 04CA1, 2004-Ohio-6598; State v.Scheer, 158 Ohio App.3d 432, 2004-Ohio-4792. Accordingly, Taylor's first assignment of error is without merit.
 III. {¶ 29} In his second assignment of error, Taylor argues that the trial court erred when it denied his motion to sever the charges. Specifically, Taylor argues that joinder prejudiced his defense and deprived him of a fair trial.
 {¶ 30} The law favors joining multiple offenses in a single trial under Crim.R. 8(A) if the offenses charged are of the same or similar character. State v. Franklin (1991), 62 Ohio St.3d 118, 122; State v.Lott (1990), 51 Ohio St.3d 160, 164; State v. Torres (1981),66 Ohio St.2d 340. However, an accused may move to sever the charges under Crim.R. 14 upon a showing of prejudice. State v. Wiles (1991),59 Ohio St.3d 71, 76. The trial court retains discretion in determining whether to try the accused separately on the different counts of the indictment. Torres, supra, at syllabus; Braxton v. Maxwell (1965),1 Ohio St.2d 134. For an appellate court to reverse a trial court's ruling denying severance, the defendant must demonstrate that the trial court abused its discretion. Lott, supra.
 {¶ 31} A Crim.R. 14 motion for severance of counts due to prejudicial misjoinder is waived unless it is renewed at the close of the state's case or at the conclusion of all the evidence. State v. Jonas, Athens App. No. 99CA38, 2001-Ohio-2497; State v. Stephens (Dec. 23, 1999), Pickaway App. No. 98CA41; State v. Strobel (1988), 51 Ohio App.3d 31;State v. Owens (1975), 51 Ohio App.2d 132. Here, Taylor failed to properly preserve his misjoinder objection. Because Taylor waived this objection, we decline to address it. Accordingly, Taylor's second assignment of error is without merit.
 IV. {¶ 32} In his third and final assignment of error, Taylor argues that the jury's guilty verdict is against the manifest weight of the evidence. Specifically, Taylor asserts that the state failed to introduce physical evidence proving force and that the alleged victims lacked credibility. For the former argument, Taylor insinuates that the state cannot prove rape without physical evidence and that Victim 2's intact hymen proves that rape did not occur. Regarding the latter argument, Taylor points to Victim 1's drug addiction and Victim 2's failure to inform persons at the convenience store of her rape as diminishing their credibility.
 {¶ 33} In deciding whether a criminal conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences therefrom, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial granted. State v.Thornburgh (Sept. 29, 1997), Lawrence App. No. 97CA21, citing State v.Garrow (1995), 103 Ohio App.3d 368, 370-71.
 {¶ 34} While an assignment of error based on the manifest weight of the evidence permits the appellate court to consider the credibility of witnesses, that power is not absolute. The weight to be given to evidence and decisions regarding the credibility of witnesses are still issues primarily placed on the trier of fact. State v. Murphy, Washington App. No. 03CA12, 2003-Ohio-4939, ¶ 15, citing State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. The trier of fact is still in the best position to gauge the credibility of witnesses and the weight of evidence as it is presented at trial. Murphy at ¶ 15. Appellate courts are cautioned to only overrule criminal convictions on the basis of the manifest weight of the evidence in "exceptional case[s] in which the evidence weighs heavily against the conviction." State v.Martin (198), 20 Ohio App.3d 172, 175. In general "a reviewing court will not reverse a conviction where there is substantial evidence upon which the court could reasonably conclude that all the elements of an offense have been proven beyond a reasonable doubt." Murphy at ¶ 15, citing State v. Eskridge (1988), 38 Ohio St.3d 56, paragraph two of the syllabus.
 {¶ 35} R.C. 2907.02(A)(2) provides that "[n]o person shall engage in sexual conduct when the offender purposely compels the other person to submit by force or threat of force." (Emphasis added.) R.C. 2901.01(A) defines force as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing."
 {¶ 36} We begin by noting that this case turns on credibility, rather than on physical evidence. A jury may convict a defendant of rape pursuant to R.C. 2907.02(A)(2) if the state proves he used a "threat of force" to engage in sexual conduct. Here, both victims testified that Taylor, who was substantially larger and stronger than they were, threatened them with a knife. Victim 1 testified that while Taylor never showed her a knife, he claimed to hold one in his pants, threatened to cut her from her throat to her stomach, and forced her into the bedroom where the rape occurred. Victim 2 testified that Taylor held a knife to her throat and then placed that knife onto the dashboard during the rape. These testimonies provide substantial evidence upon which the jury could rely in finding that Taylor used a threat of force to purposely compel the victims to submit to sexual intercourse.
 {¶ 38} We cannot find that the lack of physical evidence, such as bruising, proves that rape did not occur. A woman is not required to risk substantial injury by physically resisting a rapist. Indeed, in many cases, it is probably far wiser and safer to submit, especially when faced with the threat of a weapon, whether or not that weapon is actually revealed. A threat of force compelling an individual to engage in sexual conduct is all that is required for rape to occur, and that threat can be proven by the victims' credible testimony. Here, the victims' testimony clearly established that Taylor compelled them to engage in sexual conduct by a threat of force, as required by R.C. 2907.02(A)(2). Therefore, the jury did not lose its way and create a manifest miscarriage of justice by convicting Taylor of rape without physical evidence that Taylor used actual force.
 {¶ 38} Also, we find Victim 2's intact hymen irrelevant. Anita Brooks testified that an intact hymen does not prove that sexual penetration did not occur. That testimony alone provides substantial evidence to support the jury's guilty verdict. However, Taylor buttressed this testimony by admitting that he briefly penetrated Victim 2's vagina after he ejaculated. His testimony proves that penetration occurred, even if only for a short duration and with limited sexual arousal. Taylor cannot admit to vaginal penetration and then defend himself by arguing that the victim remains a virgin. This defense is illogical and not supported by the evidence presented at trial. Given the above testimony, the state proved, by substantial evidence, that vaginal penetration occurred and that Victim 2's hymen could remain intact despite the brief vaginal penetration.
 {¶ 39} Taylor also argues that his testimony was more credible than the victims' testimony. This court has previously noted that "reviewing courts are ill-suited to assess witness credibility. Because the trier of fact sees and hears the witnesses, the trier of fact is particularly competent to decide `whether, and to what extent, to credit the testimony of particular witnesses.' State v. Johnigan, Montgomery App. No. 19734, 2004-Ohio-260. Thus, reviewing courts must afford substantial deference to its determinations of credibility." State v. Shadoan, Adams App. No. 03CA764, 2004-Ohio-1756, ¶ 51. (Citations omitted.) Here, we find no basis on which to conclude that the victims' testimony was less credible than Taylor's. Our review of the testimony does not reveal that the jury lost its way and created a manifest miscarriage of justice. Accordingly, Taylor's third assignment of error is without merit.
 V. {¶ 40} In conclusion, we overrule Taylor's three assignments of error. Because we previously ruled that Blakely v. Washington (2004),124 S.Ct. 2531 does not apply to the Ohio sentencing scheme, we find that the trial court properly sentenced Taylor to two consecutive maximum sentences. Because Taylor failed to renew his motion to sever the charges either at the close of the state's case or at the end of all of the evidence, we find that he waived any objection to misjoinder. Finally, because substantial evidence supports the jury's verdict, we find that Taylor's conviction is not against the manifest weight of the evidence. Accordingly, we affirm the trial court's judgment.
 JUDGMENT AFFIRMED. JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that the Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Athens County Court of Common Pleas Court to carry this judgment into execution.
IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed sixty days upon the bail previously posted. The purpose of a continued stay is to allow Appellant to file with the Ohio Supreme Court an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the sixty day period, or the failure of the Appellant to file a notice of appeal with the Ohio Supreme Court in the forty-five day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Ohio Supreme Court. Additionally, if the Ohio Supreme Court dismisses the appeal prior to the expiration of the sixty days, the stay will terminate as of the date of such dismissal.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
Abele, P.J.: Concurs in Judgment and Opinion as to Assignments of Error I and III; Concurs in Judgment Only as to Assignment of Error II.
McFarland, J.: Concurs in Judgment Only.