This is an appeal from judgments of the Lucas County Court of Common Pleas which, following a jury trial, found appellants Stacy Carter, Damon Carter and Michael Carter each guilty of several counts of felonious assault and one count of aggravated murder. For the reasons which follow, this court affirms the judgments of the trial court.
Appellants Stacy Carter, Damon Carter and Michael Carter ("Stacy, Damon and Michael") were tried jointly. They filed separate appeals of the trial court's judgments and, upon the state's motion, this court ordered the three appeals consolidated. Because the appellants submitted separate briefs to this court, each appellant's assignments of errors will be set forth and addressed separately. The facts that are relevant to the issues raised on appeal are as follows.
On September 16, 1996, Stacy, Damon and Michael were charged in an indictment that contained four counts of felonious assault and one count of aggravated murder in connection with the August 10, 1996 shooting death of Tony Reynolds following a four-car chase through the streets of central Toledo. The car chase ensued after Tony Reynolds and Damon argued. Reynolds quickly left the scene of the argument and went to his mother's home, where he discussed with various friends and family members how to respond to the situation. At some point thereafter, Reynolds and several others got into three cars and headed out to find Damon. Reynolds and his party were driving a Buick, a Chevrolet Suburban and a Cadillac Seville. The Carters were driving a green Chevrolet Lumina. The cat-and-mouse game lasted only about ten minutes, but the four cars traveled numerous streets in a relatively small area before Reynolds was shot in the head after he abandoned his car in the vicinity of Monroe, Detroit and Bancroft Streets.
Each count of the indictment carried a specification pursuant to R.C. 2941.145 that the offender displayed, brandished, indicated possession of, or used a firearm, and a specification pursuant to R.C. 2941.146 that the offense was committed by discharging a firearm from a motor vehicle. The four felonious assault counts alleged a series of four separate acts committed by Stacy, Damon and Michael at different locations between 7:00 p.m. and 7:07 p.m. on August 10, 1996. The five counts, as clarified in the Bill of Particulars filed by the state, alleged as follows. The first count alleged that at approximately 7:00 p.m on August 10, 1996, Stacy knowingly operated a car from which Damon knowingly caused or attempted to cause physical harm to the three occupants of another car by firing one shot into the car. (Michael was not charged under this count.) The second and third counts alleged that, at approximately 7:00 p.m. and 7:05 p.m. at two different nearby locations, Stacy knowingly operated a car from which Damon and Michael again knowingly attempted to cause physical harm to the three occupants of the other car by firing shots into the car. The fourth count alleged that, at approximately 7:07 p.m. at another location, Stacy knowingly operated a car from which shots were knowingly fired by Michael at a vehicle occupied by Tony Reynolds in an attempt to cause physical harm to Reynolds. (Damon was not charged under this count.) The fifth count alleged that, at approximately 7:10 p.m. at another location, Stacy, Damon and Michael, acting together and with purpose to kill, pursued and killed Tony Reynolds. Trial commenced on March 10, 1997 and the following relevant testimony was presented by forty-three witnesses.
Douglas Kemp, data system manager at Lucas County 9-1-1, testified that he reviewed the tape recordings of the calls that had been placed to 9-1-1 on August 10, 1996 relating to this case and identified them so that they could be copied and placed on a single cassette tape.
Detective Terry Cousino, Toledo Police Department, testified that he was present at Reynolds' autopsy and took possession of the bullet that was removed from Reynolds' skull. Cousino further stated that he examined a maroon Buick and a brown Cadillac that had been impounded after the shooting and said he removed a shotgun shell from the Cadillac. Cousino stated that he also processed a Lumina that had been involved in the shooting. He testified that the rear passenger's side door of the Lumina had a bullet hole from a shot fired outside the car. Cousino testified that he dusted the car for fingerprints and recovered four or five partial fingerprints and a few partial palm prints. He stated that none of the readable prints found on the car matched any of the defendants' fingerprints.
Detective Chad Culpert, Toledo Police Department, testified that he was called to the vicinity of Monroe and Detroit Streets and arrived there at approximately 7:45 p.m. He stated that shortly after his arrival he took numerous color photographs of the scene and the surrounding area. Culpert identified photographs of the victim's car which depicted what appeared to be a bullet entrance hole in the trunk and the corresponding exit hole in the front passenger door. He did not find any weapons, shell casings, bullets or anything of that nature in the car. Culpert also identified photographs of the Suburban taken the day after the shooting. He stated that a shattered front wing window and damaged head liner on the driver's side of the Suburban indicated that something had entered the car. Culpert searched the car and recovered a projectile. Culpert further testified that at 10:40 p.m. on the night of the shooting he collected a sample from Damon's hands to check for gunshot residue. An analysis of the sample indicated that there was no gunshot residue on Damon's hands at the time the sample was collected. Culpert testified that a person can fire a gun or be in close proximity to a firearm that is discharged and not test positive for the presence of gunpowder residue, and that factors such as the condition of the gun and the conditions under which it is fired can influence whether residue will remain on a person's body or clothing. Detective Culpert testified that he and one of the prosecutors drove over the streets traveled by the participants in the car chase and videotaped the area. Culpert identified the tapes and narrated as they were played for the jury.
Karen McNaughton testified that on August 10, 1996, she turned into the McDonald's at Detroit and Monroe to go to the drive-through. McNaughton stated that she then heard car tires screeching and what she believed to be a gunshot. Afraid of getting stuck in line if bullets were flying, McNaughton moved her car into a parking space. She continued to hear the noise and then saw "fancy cars" approaching. She saw a candy apple red car with fancy hubcaps followed by a green car. The red car hit a concrete abutment, slid and then stopped. McNaughton saw a man get out of the red car and start to run and then saw a man with a gun in the front passenger side of the green car. She saw the man in the green car shoot and the man who had gotten out of the red car fall. The green car then sped away. McNaughton further testified that there was no doubt in her mind that the shots fired at the victim were fired by someone in the green car. She stated that after the green car left the scene a brown car pulled up and several people got out and walked over to the man on the ground. One of the men was holding a shotgun. They looked at the victim briefly and then got back in their car and drove away. McNaughton testified that all of the people she saw in the green car and in the other car that pulled up and left were African-American.
Ernestine Harris testified that at about 7:00 p.m. on August 10, 1996, she was driving on Detroit Avenue toward Monroe Street when she heard gunshots. She then saw a maroon car with one man in it and another large dark green car come out from between two buildings. Harris saw a man in the front passenger seat of the second car shooting at the first car. She testified that she heard a shot and saw the tire blow out on the first car. The car stopped and the driver got out. She heard another shot and saw the man fall to the ground.
Jacqueline Barney, Harris' daughter, testified that she was in the car with Harris when she heard shots fired. She saw a maroon car pull out of a parking lot with a dark blue car following behind. She testified that the maroon car turned, the boy jumped out and he was shot. Barney testified that the shots came from the blue car and said she saw three people in that car. She further stated that the person in the front passenger seat had a gun.
Stacy Campbell testified that on August 10, 1996, in the early evening, she was standing outside her grandmother's house talking to Tony Reynolds when Damon Carter drove up and said something to Reynolds. Campbell stated that Damon made some U-turns in front of the house and she and Reynolds then realized that he had a gun. She testified that Reynolds ran between the houses and she went inside. Campbell further testified that Reynolds then got in his car, which was a maroon Buick. She stated that she came back out and saw Reynolds "fly by" with Damon's car behind him. She further stated that she saw Michael Carter in the front passenger seat and Damon Carter in the back seat, both hanging out the window. She testified that Damon had a gun in his hand and Michael had something in his hand that looked like a bottle. The cars headed toward Bancroft Avenue and she heard shots fired.
Kimberly Armstrong testified that on the evening of August 10, 1996, she called 9-1-1 because she saw cars racing down her street three or four times and heard gunfire. The prosecutor played the tape of Armstrong's call in which she referred to a red car and a green car. Armstrong testified that she did not see any shots fired from the red car but did see shots fired from the passenger side of the green car the last time it passed by her house. She further stated that she did not see any guns in any of the other cars. She identified a photograph of the red car with gold rims that was being chased.
Coriander McNaughton testified that on August 10, 1996, she and her mother were turning into the McDonald's drive-through when they heard a gunshot and tires squealing. She stated that she knows the difference between the sounds of a pistol and a shotgun firing and said that the first gunshot sounded to her like it came from a pistol. Coriander stated that her mother pulled out of the line and into a parking space. She testified that she then saw a maroon car pull into the intersection followed by a green car. She said she heard a second shot and then saw the driver of the maroon car get out and take about three steps. Coriander testified that she then saw the green car approach, a man on the passenger side hold out his hand, take aim and shoot the first man in the back of the head. She stated that the victim fell to the ground and the green car drove away. She further stated that there were three black men in the green car. Coriander testified that after Reynolds was shot, a brown car drove up and five or six people, one of whom had a shotgun, got out of the car, shouting and cursing. She stated that they walked over to Reynolds, looked at him, cursed and drove off again.
Gwendolyn Phillips testified that she knows Stacy, Damon and Michael Carter. She stated that she was coming out of a mini-mart on the corner of Monroe and Auburn on August 10, 1996, when Stacy Carter pulled in, driving a green four-door car. She stated that Michael Carter was in the front passenger seat and Damon Carter was in the rear passenger seat. Phillips testified that Stacy got out of his car and walked over to her car. She stated that Stacy called her friend, who was sitting in her car, a "bitch" and slapped her on the mouth. Phillips spoke to Michael and Damon and then heard Stacy yell, "There go those niggers." The Carters' car then pulled away quickly. She did not see where the Carters' car went but did see Tony Reynolds drive by, followed by a brownish or maroon car and a truck. She then saw Carters' car drive by again "out of nowhere" and on two wheels, with Michael hanging out the passenger window with something in his hand. She then could hear shooting. She started to drive away but ended up back in the middle of the shooting. Phillips testified further that she then saw the maroon car coming toward her looking as if it were out of control. She saw Reynolds get out of the car and start to run. She grabbed her children and got down on the floor of her car but before she did that she saw the green car following behind Reynolds' car. Phillips saw a brownish car stop. She saw a man holding a shotgun get out, swear and get back in the car.
Phillips further testified that she drove to the Carters' mother's house to talk to her. Mrs. Carter gave Phillips two clean shirts for Michael and Stacy and Phillips drove back to the scene of the shooting. When she got to the corner of Bancroft and Auburn Streets she saw Stacy and Michael and gave them the shirts. They got in the car with her and directed her to where Stacy's car was parked. Stacy then asked her to drive his car to his friend's house. Phillips drove Stacy and Michael where they wanted to go in the green car, parked it and gave the keys back to Stacy. Stacy gave the keys to Michael and told him to park it somewhere near their father's house. Michael then changed into one of the new shirts and put the old one in Phillips' car. Phillips testified that Michael was joking and laughing. Eventually, Stacy came up to them, changed his shirt and gave the old one to Phillips, who put it in her car. Stacy left by himself and Phillips and her friend drove Michael to someone else's house.
Phillips testified that later that evening she was paged by Stacy. She called him back and he told her she could go downtown if she felt she had to, so she drove to the Safety Building and told a detective everything she had seen that evening. Phillips said she did not at any time see any weapons in Reynolds' car but did see someone in the front passenger seat of the brown car holding a big gun.
Daniel Williams testified that on the evening of August 10, 1996, he was in his car heading north on Detroit Avenue at Bancroft. He stated that just as the light was about to turn green, he heard screeching tires. He saw a red car "coming sideways" down Bancroft. The car skidded to a stop and two black males jumped out and ran off. Williams then looked back toward Bancroft and saw a burgundy car stopped with a man sitting on the window ledge pointing a rifle over the roof of the car. That car left the scene. Williams said he also saw a green or turquoise car almost hit the red car. He further testified that he then drove to the next traffic light, where he saw a man standing beside the red car, which was blocking one of the southbound lanes on Detroit Avenue. Another car drove up, blocking Williams' view, and he heard a gunshot. The car drove away and Williams saw that the man who had been standing by the red car was lying on the ground. Williams stated that he did not see who shot the man. Williams' wife, Kathy, gave testimony confirming that of her husband.
Anissa Tucker testified that on August 10, 1996, she was in her car in the right-hand lane on Detroit Avenue heading toward Bancroft. She stated that she looked ahead of her and saw two men running through the traffic. She then saw a burgundy car approaching fast. The car turned the corner and ran into a pole or curb, which caused a tire to go flat. The driver got out of his car, took a few steps, and was shot once by a man in the back seat of another car.
Billie Logan testified that on the night of the shooting he was in his car headed north on Detroit Avenue when he saw a "reddish-maroon" car speed by on Bancroft Avenue. He saw the car lose control and spin in a circle. Two people jumped out of the car and ran away. He then saw a green car coming at the maroon car and heard gunshots. Logan started to pull away and saw the maroon car stop. The driver jumped out of the car and started to run just as the green car returned. He then heard one gunshot and saw the man fall. The green car then sped away.
Barbara O'Mara testified that she was at the intersection of Monroe and Detroit at the time of the shooting. She stated that as she waited for the light to turn green, she heard one or two gunshots and then saw a maroon car turn onto Monroe Street. The car was going so fast that when it turned onto Monroe it went onto the curb and the tires on the right side were damaged. After the car went up the curb she saw a green car come from the same general area and follow it. O'Mara further testified that she saw a man standing by himself and then heard a gunshot and saw him fall. She identified a tape of the 9-1-1 call she made immediately following the shooting in which she told the operator that she was not sure but thought the last gunshot she heard came from a brown car, but then testified that she was not sure where the gunshot came from.
Cordney Middlebrooks stated that on the evening of August 10, 1996, he was at the gas station at Monroe and Detroit when he saw a green car chasing a red car. He stated that he saw two guns pointing out of the front and back passenger side of the green car. He then saw the red car crash and the green car "block it off." The driver of the red car jumped out and ran about ten steps before someone from the green car shot him. He stated that the victim was about a car's length from the green car when he was shot. He stated that he did not see any shots come from the red car. Middlebrooks testified further that after the green car left, a brown Seville pulled up and "quite a few boys" jumped out with a shotgun and a handgun. He stated that they waved their guns around but he did not hear what they said. The brown car left before the police and ambulance arrived. Middlebrooks further stated that when he spoke to a detective a couple of days after the shooting he said that the driver of the green car had a gun and did not say anything about the passengers having guns. He further stated it was his testimony that the driver and the passengers all had guns.
Ron Hopings testified that on the evening of August 10, 1996, he was sitting in Tony Reynolds' car while Reynolds talked to his girlfriend. He stated that a person named Ronnell was also in the car. Hopings testified that while Reynolds was talking to his girlfriend Damon Carter pulled up in a blue Cadillac, made a couple of U-turns and got out of the car with a .38 revolver in his hand. Reynolds then got out and ran between the houses. Damon drove off and Hopings drove to Reynolds' mother's house. Three of Reynolds' brothers and his father were there. Hopings eventually left with Ronnell and Reynolds in Reynolds' car. Two other cars — a white Suburban and a brown Cadillac — drove with them as they circled through the neighborhood looking for Damon's blue Cadillac. Hopings stated that they could not find Damon and were headed back to Reynolds' mother's house when their car was hit from behind as they were about to make a turn at Monroe and Auburn. He stated that he did not recognize the car that hit them but recalls that it was green and said he saw Damon, Michael and Stacy in the car. They continued driving and the green car followed. Ronnie ducked down and heard "one or two" shots fired. He stated that when they got to the area of Bancroft and Detroit the car started swerving and he and Ronnell jumped out and ran behind a house. Ronnie testified that neither he, Ronnell nor Reynolds had a gun. He further stated that as he was running he heard four or five gunshots.
Cynthia Beisser, a forensic pathologist with the Lucas County Coroner's office, testified that she performed the autopsy on Tony Reynolds, which revealed that Reynolds had a gunshot wound on the right side of his head above the ear.
Roscoe Shaffer, Jr. testified that he works at Fred's Auto Parts, located at the intersection of Monroe and Bancroft. Shaffer stated that he was waiting on a customer at approximately 7:00 on August 10, 1996, when he heard cars racing through the store lot. He then heard what he initially thought was a tire blowing out. He stated that he looked out the door and saw a Cadillac Seville heading towards Fred's lot. He saw a man in the right rear seat holding a shotgun and a man in the front passenger seat with a gun. Shaffer then saw a green car chasing a red car. At one point he saw a man in the green car gesture with his arm as if he were aiming a gun but he did not see a gun. Robert Warren and Kenneth Tisdel, who also were working at Fred's at the time of the shooting, offered testimony that essentially corroborated that of Shaffer. Warren also saw a man pointing a shotgun out of the rear window of the Cadillac. Tisdel testified to seeing two guns in the Cadillac.
Jamar Duhart testified that he was Tony Reynolds' brother. He stated that he was at home with his father and brothers at about 7:00 on the evening of August 10, 1996, when his brother Tony came by with Ronnell and Ronnie. Tony talked to his father and they all left. Jamar left with his brother Kendrick and two other males in a brown Seville. Jamar's father, Tony Duhart, left in a red and white Suburban with Jamar's brother Jason and another male. Reynolds car was in the lead and they started driving around the area "to see what was the problem" with the Carters. When they were at Auburn and Baxter Streets the Carters pulled in front of them in a green car. The green car pulled behind Reynolds' car and Reynolds took off. Jamar testified that he could see that Stacy was driving, Michael was in the front passenger seat and Damon was in the back seat. Jamar lost sight of his brother's car briefly and then saw it drive by with the Carters' car following, its occupants shooting at them. Jamar testified that he saw guns and heard gunfire and saw Damon and Michael with guns. Jamar's car followed. Jamar testified that Anthony Ruffin, who was in the front seat of his car, leaned out the window and fired a rifle over the roof. He further testified that Ruffin missed and the shot went into the trunk of Reynolds' car. Jamar stated that there were no other guns in the car and that was the only time he saw that gun being fired. At one point, Jamar saw his brother lose control of his car and saw the two passengers in that car jump out and run away. Jamar lost sight of his brother's car and the Carters' car and the next thing he saw was his brother lying on the ground next to his car. Jamar further testified they pulled up next to his brother, stayed for a minute or so and left.
Jason Duhart testified that he was at home on the evening of August 10, 1996, when his brother Tony Reynolds came home and talked to their father. As a result of that conversation, they all got into their cars and left in the Suburban, the Buick and the Cadillac. Jason stated that he was in the Suburban and his father was driving. Jason described the various routes they took as they drove through the neighborhood looking for the Carters' car. Jason testified that at one point his father's car and the Carters' car were driving straight at each other about to hit head-on. He stated that his father told him to get in the back seat and that before he lay down on the seat he saw Damon Carter with a gun in his hand and that Damon fired a shot at them from the back passenger seat of the green car. He further stated that the bullet entered the car through a front vent window and went straight up over his father's head. Jason stated that after that, he told his father that his brother got away, and they went home. He further testified that his father did not have a gun in the car with them.
Bradley Weis, a sergeant with the Toledo Police Department, testified that he was dispatched to the scene of the shooting at approximately 7:05 p.m. on August 10, 1996. Weis stated that when he arrived he saw Reynolds on the ground and several people leaning over him. Weis testified that he did not see any weapons at the scene and had no way of knowing if anyone had removed a weapon before he arrived.
Tony Duhart testified that Tony Reynolds was his son. Duhart stated that on the evening of August 10, 1996, he was working on a car in his son's yard when Reynolds drove up. He and Reynolds talked and then they left, each in his own car. Duhart detailed the route they took as they drove through the neighborhood looking for the Carters. Eventually he saw the Carters in a green Lumina pulling out of a lot at Auburn and Monroe. He stated that Stacy was driving and Damon and Michael were passengers. Duhart testified further that the Carters pulled past him. Reynolds somehow hit Carters' car, which went up onto the curb. Reynolds kept going and Duhart followed him. The Carters' car was behind Duhart at that time. They all continued to drive through numerous streets and eventually Reynolds turned and Duhart continued straight. The Carters then followed Reynolds. Duhart made several turns and came upon Reynolds head-on, with the Carters behind Reynolds. Duhart testified that he swerved toward the Carters' car and a shot was fired at him from the passenger's side of the car. Duhart then returned to Reynold's house.
Officer Anna Latscha, Toledo Police Department, testified that at approximately 7:05 p.m. on August 10, 1996, she was dispatched to Detroit and Castle on a report that a man had been shot in the alley. When she arrived at that location, she discovered a Cadillac that appeared to have been abandoned and found a shotgun slug on the floor of the car. Latscha testified that she was unable to locate the owner of the car at the scene. When she checked the license plates, they came back under the name Tony Reynolds but the VIN number came back under the name Tony Duhart.
At this time, the state read to the jury the deposition testimony of Father Martin Donnelly, a pastor at St. Martin de Porres Parish at the corner of Detroit and Bancroft Streets in Toledo. Father Donnelly testified that on August 10, 1996, he called 9-1-1 and reported a shooting at the intersection in front of the church. He stated that he was sitting by an open window in the church when he heard tires screech. He looked up and saw two cars, one chasing the other along Bancroft. He testified further that he saw a man who was hanging out the window of the second car fire a shot toward the first car. Father Donnelly thought that the first car was blue and the car behind it brown.
Officer Norman Cairl, Toledo Police Department, testified that he was dispatched to the vicinity of Monroe and Detroit Avenues after the shooting. After speaking to people at the scene, including Tony Duhart, he and another officer began looking for Damon Carter. The officers spotted Damon at approximately 8:00 p.m. and took him into custody.
Officer Clinton White, Toledo Police Department, testified that on the night of August 10, 1996, he was working plainclothes and was sent to the Hillwood/Cherry Street area to set up surveillance for Stacy Carter. He stated that while sitting in an unmarked car at approximately 3:40 a.m., he saw a black male he believed to be Stacy Carter come from behind some bushes on Hillwood, walk down the street and then run back into the bushes. Officer White did not see Stacy again until he was apprehended shortly thereafter.
Sergeant Deonn Bartel, Sergeant Robert Marzec and Lieutenant Robert Pepitone, Toledo Police Department, testified as to their search for Stacy on the night of the shooting. Bortel testified that Stacy was arrested while riding in a car that was turning onto an entrance ramp to northbound I-75. Bortel found a bag containing toiletries and clothing in the car but found no weapons.
Sergeant Gerald Lazette, Toledo Police Department, testified that at approximately 3:30 a.m. on August 14, 1996, one of his men located the green Chevrolet Lumina believed to have been involved in the shooting.
Robert McCurdy testified that he is a manager for Enterprise Rent-A-Car and stated that on July 11, 1996, a Dennis Mack rented a green Chevy Lumina and returned it on August 27, 1996. Dennis Mack testified that he rented the Lumina on behalf of a friend so that she could use it for a few days.
Detective William Goetz, Toledo Police Department, testified that he was currently assigned to the Scientific Investigation Unit. Goetz stated that on August 14, 1996, he examined a Chevy Lumina and processed it for fingerprints and other evidence. He further testified that he found a receipt from U.S.A. Mobile with Stacy Carter's name on it in the car. He also found parts of a projectile lodged in the right rear door panel and pieces of glass from the shattered rear window.
The state recalled Gwendolyn Phillips, who testified that when she drove the green Lumina on the night of August 10, 1996, the rear window was not damaged and there was no glass in the car. She further stated that there were no bullet holes in the exterior of the car when she drove it.
Edward Franks, a criminalist in the Toledo Police Department forensics laboratory, testified that tests for detecting gunshot residue on a person's hands are subject to problems because some firearms do not leave a measurable amount of residue behind and because the results can be affected by environmental conditions such as extreme cold, high humidity and rain. He stated that the test is extremely unreliable. Franks further testified that he tested the two shirts that were recovered from the Lumina for the presence of vaporized lead, which firearms can deposit on clothing. He stated that he did not find evidence of lead on either of the shirts but said the fact that he did not find any residue does not prove that whoever was wearing them had not fired a gun because, in order to leave any meaningful depositing patterns, the muzzle blast would have to be within one foot of the shirt. Franks further testified that he examined and compared the bullet fragments from Reynolds' skull and the one found in the roof of the Suburban and determined that they had been fired from the same handgun. Franks further stated that he was given a handgun and asked to compare the two bullets obtained earlier with the gun to attempt to determine whether those bullets were fired from that handgun. He testified that he test fired the handgun and then studied those bullets. Franks testified that based upon a comparison of the two original bullets and the test-fired bullets he believed that there was a good possibility the handgun he tested was the murder weapon.
Officer Byron Daniels, Toledo Police Department, testified that on March 5, 1997, he arrested Nesbitt Carter in connection with a reported breaking and entering. Daniels stated that he searched Carter's vehicle and confiscated a handgun. Daniels identified the gun that had been test-fired by Franks as the same gun that had been found in Nesbitt Carter's car.
The state rested its case. The defense for Stacy Carter presented the following witnesses.
Gwendolyn Phillips was recalled and testified as follows as on cross-examination. Phillips testified that when she was at the intersection of Monroe and Detroit she saw a brown car pull up and an older man get out. The man was holding a gun. Phillips did not recognize the man, but several weeks later she saw Tony Duhart being interviewed on the television news and recognized him as the man she had seen get out of the car with a gun after the shooting.
Nesbitt Carter testified that he does not know any of the defendant Carters and is not related to any of them. He further testified that when he was arrested on March 5, 1997, he was on his way to see his pastor. Carter stated that he was going to turn his gun over to his pastor because he was very upset about his personal life and had been thinking about hurting himself. He identified the gun that had been test-fired by Franks as being his gun. He stated that he has owned the gun for eight years and keeps it in a locked closet. Carter testified that he has never loaned the gun to anyone.
Detective Jesse Villarreal was called by the defense as on cross. Villarreal testified that he was the lead investigator in this case. He stated that he had interviewed Tony Duhart and that Duhart never told him that a shot was fired into his Suburban as he tried to ram the Carters' car.
Detective Manuel Soto testified that he interviewed Tony Duhart at the hospital the night Duhart's son died and that Duhart did not state that Carters fired a shot into his car as he was trying to ram their car. Soto stated that Duhart told him the shot was fired when he was passing the Carters' car. He further testified that Duhart did not tell him that his son rammed his car into the Carters' car. Soto stated that he also interviewed Gwendolyn Phillips and that Phillips told him she saw the second and third cars in the chase fire shots in the direction of Stacy Carter's car.
Detective Robert Leiter testified as on cross-examination that he interviewed Ken Tisdel from Fred's Auto Parts and that Tisdel stated that he saw someone in a Cadillac Seville with a shotgun and someone in the same car with a pistol with what appeared to be a silencer on it. He further testified that Tisdel told him that he heard two shots come from the Seville but that only one of them sounded like a shotgun.
On March 25, 1997, the jury returned its verdicts. As to Stacy, the jury found him guilty of three counts of felonious assault and one count of aggravated murder. The jury also found Stacy guilty of both specifications attached to each of the counts.
As to Damon, the jury found him guilty of two counts of felonious assault and one count of aggravated murder and found him guilty of both specifications attached to each of the counts.
As to Michael, the jury found him guilty of two counts of felonious assault with both specifications and one count of aggravated murder with both specifications.
STACY CARTER
Appellant Stacy Carter sets forth the following assignments of error:
"First Assignment of Error
 THE TRIAL COURT ERRED IN FAILING TO RECOGNIZE THAT A POLICE OFFICER'S SUMMARY OF WHAT A WITNESS TELLS HIM IS A STATEMENT BY THE POLICE OFFICER DISCOVERABLE UNDER THE TERMS OF CRIM. R. 16(B)(1)(g).
"Second Assignment of Error
 THE TRIAL COURT ABUSED ITS DISCRETION, ERRED TO THE PREJUDICE OF APPELLANT STACY CARTER, AND DENIED HIM HIS RIGHTS TO FAIR TRIAL AND DUE PROCESS AS PROTECTED BY THE CONSTITUTIONS OF THE UNITED STATES OF AMERICA AND OF THE STATE OF OHIO WHEN IT GRANTED THE STATE'S MOTION TO CERTIFY WITNESSES.
"Third Assignment of Error
 THE TRIAL COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES WHEN THE OFFENSES ARE ALLIED OFFENSES OF SIMILAR IMPORT.
"Fourth Assignment of Error
 THE TRIAL COURT ERRED IN IMPOSING SEPARATE AND CONSECUTIVE SENTENCES FOR THE FIREARM SPECIFICATIONS ATTACHED TO COUNTS ONE, TWO, FOUR, AND FIVE.
"Fifth Assignment of Error
 THE TRIAL COURT ERRED IN IMPOSING SEPARATE SENTENCES FOR BRANDISHING A FIREARM AND FOR DISCHARGING A FIREARM FROM A MOTOR VEHICLE.
"Sixth Assignment of Error
 THE CONVICTIONS OF APPELLANT STACY CARTER ARE NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
"Seventh Assignment of Error
 INSOFAR AS ANY ERROR COMPLAINED OF WAS NOT ADEQUATELY PRESERVED BELOW, APPELLANT STACY CARTER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL."
In his first assignment of error, Stacy Carter asserts that the trial court erred by failing to recognize that a police officer's summary of what a witness tells him is the officer's "statement" and therefore discoverable pursuant to Crim. R. 16(B)(1)(g). Stacy argues that the law governing the discoverability of witnesses' statements was misapplied in this case. He argues that an officer's notes regarding what he is told by a witness represent the officer's observations just as would his notes if he recorded what he saw at a crime scene. He asserts further that to the extent an officer's notes "reflect his auditory observations of what a witness said to him," they fall within the scope of Crim. R. 16(B)(1)(g).
The state responds that those portions of a police officer's report that recite matters beyond the officer's own statements, such as his notes on what a witness told him, are privileged and excluded from discovery under Crim. R. 16(B)(1)(g). The state asserts that, if and when the officer testifies, his report is a prior "statement" that he made and he could be compelled to produce the report for in camera inspection to determine whether there are inconsistencies between his testimony and his report. The state further asserts that the law does not permit defense counsel to cross-examine a lay witness on the basis of the officer's synopsis of an interview with that witness, which is what the defense attempted to do at trial, when the witness has never seen the officer's report.
Crim. R. 16(B)(1)(g) provides as follows:
 "Upon completion of a witness' direct examination at trial, the court on motion of the defendant shall conduct an in camera inspection of the witness' written or recorded statement with the defense attorney and prosecuting attorney present and participating, to determine the existence of inconsistencies, if any, between the testimony of such witness and the prior statement. * * * "
Crim. R. 16(B)(2) provides:
 "Except as provided in subsections (B)(1)(a), (b), (d), (f), and (g), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case, or of statements made by witnesses or prospective witnesses to state agents." (Emphasis added.)
Several times during trial, following the testimony of various lay witnesses, defense attorneys moved pursuant to Crim. R. 16(B)(1)(g) for the court to review the "statements" of that lay witness for inconsistencies between the witness's in-court testimony and the information he or she provided to police as reflected in a police report. The state objected each time, arguing that a police report that the witness has not seen or otherwise adopted is not the witness's "statement." In those instances where a witness testified that he or she had seen and somehow affirmed the police officer's summary of the witness's statement, the trial court conducted an in camera inspection to determine whether there were inconsistencies between the testimony and the "statement." If inconsistencies were found, the defense was permitted to cross-examine the witness as to the inconsistencies. Absent any testimony that the witness had seen and adopted or otherwise accepted the report as his or her "statement," the trial court denied the defense requests for an incamera to inspect the "statements" for inconsistencies.
Appellant relies on State v. Jenkins (1984), 15 Ohio St.3d 164, in which the Supreme Court of Ohio applied Crim. R. 16(B)(1) and (2) and ruled that those portions of a police officer's report recording the officer's personal observations and recollections of the events were subject to scrutiny under Crim. R. 16(B)(1)(g) for purposes of allowing defense counsel to conduct cross-examination of the officer.
 "Clearly, a signed written statement of a state witness would serve the purpose of Crim. R. 16(B)(1) (g) and fall within the plain meaning of the word `statement,' just as would a recording of the witness' words or a transcription thereof. We see no reason why the mere fact that the document was a report of a police officer would automatically bar its disclosure. * * * " Jenkins at 225.
Jenkins, however, specifically excluded other portions of a police report from scrutiny, including witness statements, in accordance with Crim. R. 16(B)(2):
 "This is not to say that all portions of a police report are discoverable under Crim. R. 16(B)(1)(g). Reading this section in pari materia with Crim. R. 16(B)(2), it becomes apparent that those portions of a testifying police officer's signed report concerning his observations and recollection of the events are `statements' within the meaning of Crim. R. 16(B)(1)(g). Those portions which recite matters beyond the witness' personal observations, such as notes regarding another witness' statement or the officer's investigative decisions, interpretations and interpolations, are privileged and excluded from discovery under Crim. R. 16(B)(2). * * * " [Emphasis added.] Id.
Upon consideration of the record of proceedings in this case and the law, this court finds that the trial court did not misapply Jenkins and in fact correctly applied the law several times to appellant's benefit by reviewing police reports in camera
for inconsistencies and then allowing the defense to cross-examine certain lay witnesses. Accordingly, appellant Stacy Carter's first assignment of error is not well-taken.
In his second assignment of error, Stacy Carter asserts that the trial court erred by granting the state's motion to certify its witnesses. Stacy argues that the testimony presented by the state in support of its motion related to past conduct and conduct mostly unrelated to the Carters. Stacy argues that the state did not present any evidence linking any of the defendants or their family members to threats against the witnesses in this case. He further argues that the trial court's ruling deprived him of the opportunity to interview witnesses prior to trial and left him unable to present an effective defense.
The state responds that Crim. R. 16(B)(1)(e) does not require the state to provide proof beyond a reasonable doubt that harm will occur unless the court acts to prevent it by certifying the witness list. The state asserts that through testimony presented at the certification hearing held on November 1, 1996, it sufficiently established a past history of intimidation of witnesses and violence by the Carter family and that threats had been made against some of the state's witnesses in this case.
Several months before trial, the state requested pursuant to Crim. R. 16(B)(1)(e) that the names and addresses of approximately twenty lay witnesses be withheld from the defense until the witnesses testified at trial. The trial court agreed to hear the details of the state's motion in chambers out of the presence of the defendants or their counsel, in accordance withState v. Gillard (1988), 40 Ohio St.3d 226. In chambers, the state testified that: threats had been made by members of the Carter family against witnesses in prior cases involving Stacy and Damon; a witness who testified against Damon in another trial was harassed, threatened and intimidated immediately after the trial by Damon and other members of the gang to which he belongs; three witnesses in this case who worked at Fred's Auto Parts received an anonymous telephone call before trial threatening anyone who testified; and numerous other witnesses in this case had expressed great concern for their safety and reluctance to testify against any member of the Carter family. At the conclusion of the hearing, the trial court granted the state's request.
The right to confront witnesses is guaranteed to an accused through the Sixth and Fourteenth Amendments to the United States Constitution and by Section 10, Article I of the Ohio Constitution. State v. Daniels (1993), 92 Ohio App.3d 473, 480, citing State v. Williams (1986), 23 Ohio St.3d 16. This right is limited, however, by Crim. R. 16(B)(1)(e), which permits a trial court to issue an order allowing the state to withhold the name and address of a witness if the state certifies that disclosure may subject the witness to physical harm or coercion.Daniels, supra, citing State v. Parson (1983), 6 Ohio St.3d 442. Certification by the state under Crim. R. 16 is not satisfied by the prosecutor's merely stating his conclusion that a witness might be subject to harm; it requires the state's reasons for requesting witness protection to appear on the record. Daniels,supra, citing State v. Williams, supra, and State v. Owens
(1975), 51 Ohio App.2d 132. The state must show the existence of an undue risk of harm in order to be relieved of its obligation to disclose the names of its witnesses. Gillard, supra. Finally, where relief from discovery is sought in this manner, the procedure must be ex parte to prevent the defense from discovering the identities of the endangered witnesses. Gillard, supra.
A thorough examination of the record in this case shows that the trial court followed the proper procedure as outlined above for handling the state's request. A review of the testimony taken at the ex parte hearing indicates that the state demonstrated the existence of an undue risk of harm to potential witnesses if their identities were revealed prior to trial. Additionally, the witnesses' identities were not absolutely withheld since they were present at trial and subject to cross-examination. See State v. Williams, supra. We further find that appellant Stacy Carter has failed to show how his defense was prejudiced by not having access to the witnesses' names and addresses prior to trial. Accordingly, we find that the trial court did not abuse its discretion by granting the state's motion to certify its witness list and appellant Stacy Carter's second assignment of error is not well-taken.
In his third assignment of error, Stacy asserts that the trial court erred by imposing consecutive sentences for his convictions for felonious assault and aggravated murder when the offenses are allied offenses of similar import. Stacy argues that simply because several shots were fired during the course of the chase and gun battle does not mean several different offenses were committed. He asserts that the record clearly shows that the crimes were neither committed separately nor with a separate animus and that he therefore should have received only one sentence, not four separate sentences.
The state responds that the shots fired by the Carters were fired at completely different locations, by two different guns, and at different victims. The state argues the fact that the Carters should not be rewarded for failing to shoot Tony Reynolds in their earlier attempts by treating their conduct as one offense.
R.C. 2941.25 provides as follows:
"* * *
 "(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them." (Emphasis added.)
While each of the counts of felonious assault are offenses of similar import, the facts in this case lead to the conclusion that each offense was committed separately. The assaults on Tony Duhart's car and on Tony Reynolds' car did not occur at the same time, nor did they occur in the same location. Further, the acts in at least two of the counts were perpetrated against different victims. While only a few minutes and a few blocks separated each of the acts, that separation in time and distance is sufficient to support the finding that each act was committed separately. Because we conclude that Stacy's offenses were committed separately, we find it unnecessary to decide whether they were committed "with a separate animus as to each," as Stacy claims.
Accordingly, we find that the trial court properly sentenced Stacy Carter separately on each of the counts for which he was convicted and Stacy's third assignment of error is not well-taken.
In his fourth assignment of error, Stacy asserts that the trial court erred by imposing multiple sentences for the firearm specifications since, he argues, the shootings were part of a single transaction.
R.C. 2929.14(D)(1)(a)(i) provides that a three-year sentence must be imposed on a defendant who commits a felony while having a firearm in his possession or under his control and while displaying or brandishing the firearm. The statute further provides that "[a] court shall not impose more than one additional prison term on an offender under this division for felonies committed as part of the same act or transaction." Additionally, R.C. 2929.14(D)(1)(a)(ii) provides for a mandatory five-year sentence when a defendant causes or attempts to cause death or physical harm to another by discharging a firearm from a motor vehicle. This statute also states that the trial court must not impose more than one additional prison term under this division "for felonies committed as part of the same act or transaction."
Stacy Carter received an additional three-year sentence and an additional five-year sentence along with each of the three sentences for felonious assault and the one sentence for murder, all to be served consecutively. Whether any of the felonies were committed as part of the same act or transaction is a factual determination to be made by the trial court. State v. Runschlag
(March 12, 1986), Summit App. Nos. 12270, 12281, unreported. If the record contains sufficient evidence to support the trial court's determination, we will not substitute our judgment for the trial court's. Id.; State v. Hague (May 10, 1989), Summit App. No. 13859, unreported, at 3.
Upon consideration of the applicable law and our finding as to Stacy Carter's third assignment of error that the offenses in this case were committed separately, we find that the trial court did not err by imposing consecutive sentences for each of the firearm specifications attached to each count of the indictment. Appellant Stacy Carter's fourth assignment of error is not well-taken.
Stacy's fifth assignment of error also arises from the trial court's imposition of sentence. Stacy argues that the trial court erred by imposing separate and consecutive sentences for the two firearm specifications, claiming that by doing so, the trial court violated the double jeopardy clauses of the United States and Ohio Constitutions, as well as R.C. 2941.25, which provides that where the same conduct by a defendant can be construed to constitute two or more allied offenses of similar import the defendant may be charged with all such offenses but convicted of only one.
Both prongs of Stacy's argument are premised on the mistaken assumption that firearm specifications are "offenses." The double jeopardy clauses and R.C. 2941.25 are intended to prevent a defendant from being tried and convicted or sentenced more than once for the same offense. Firearm specifications, however, are not separate offenses and thus cannot be "allied offenses of similar import" as contemplated by R.C. 2941.25. Statev. Blankenship (1995), 102 Ohio App.3d 534, 547. Further, imposition of more than one specification does not violate the Double Jeopardy Clauses of the Ohio and United States Constitutions, since the specifications are not offenses but rather "enhanced punishment." Id.
Additionally, and very importantly, the language of R.C.2929.14, Ohio's general sentencing statute, clearly contemplates and allows sentences for multiple specifications exactly as imposed in this case. Division (D)(1)(a)(i) of that section provides for the additional three-year prison term for the basic firearm specification. Division (D)(1)(a)(ii) provides for the additional five-year prison term for the specification charging the offender with discharging a firearm from a motor vehicle. In division (D)(1)(a)(ii), the statute states in relevant part:
 "* * * If a court imposes an additional prison term on an offender under this division relative to an offense, the court also shall impose an additional prison term under division (D)(1)(a)(i) of this section relative to the same offense, provided the criteria specified in that division for imposing an additional prison term are satisfied relative to the offender and the offense." (Emphasis added.)
Division (D)(1)(a)(i) states in relevant part:
 "* * * If a court imposes an additional prison term under division (D)(1)(a)(ii) of this section, the court is not precluded from imposing an additional prison term under this division." (Emphasis added.)
Thus, the legislature clearly has contemplated and authorized imposition of additional sentences for both the general firearm specification and the motor vehicle specification relative to the same offense. Upon consideration of the law as stated above, this court finds that the trial court did not err by imposing sentences for both specifications and Stacy Carter's fifth assignment of error is not well-taken.
In his sixth assignment of error, Stacy asserts that the convictions were not supported by the weight of the evidence. Stacy argues that "it is simply impossible" to determine who fired the guns and which shots came from which vehicles.
Weight of the evidence indicates that the greater amount of credible evidence supports one side of an issue more than the other. State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting Black's Law Dictionary (6 Ed. 1990) 1594. The Ohio Supreme Court has defined the standard applied to determine whether a criminal conviction is against the manifest weight of the evidence:
 "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." Id. at 388, citing Tibbs v. Florida (1982), 457 U.S. 21, 42.
To determine whether this is an exceptional case where the evidence weighs heavily against conviction, an appellate court must review the record, weigh the evidence and all reasonable inferences, and consider the credibility of witnesses. Id., quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. Only if we conclude that the trier of fact clearly lost its way in resolving conflicts in evidence and created a manifest miscarriage of justice will we reverse the conviction and order a new trial.Id.
We have thoroughly reviewed the evidence in this case as summarized above and find no indication that the trier of fact lost its way or created a manifest miscarriage of justice by finding appellant guilty of three counts of felonious assault and one count of aggravated murder. Numerous eyewitnesses placed Stacy in the car from which shots were fired and several placed him at the scene of the murder. Accordingly, Stacy Carter's sixth assignment of error is not well-taken.
In his seventh assignment of error, Stacy asserts that "insofar as any error complained of was not adequately preserved below," he was denied effective assistance of counsel. In this "catch-all" assignment of error, Stacy fails to cite to the record at all or articulate any instances wherein counsel's performance fell below an objective standard of reasonableness. Based upon this court's thorough review of each of Stacy's assignments of error and our conclusions that the trial court did not commit any of the errors as claimed, we find his seventh assignment of error not well-taken.
DAMON CARTER
Appellant Damon Carter sets forth the following assignments of error:
 "1. THE TRIAL COURT ERRED TO THE PREJUDICE OF THE APPELLANT BY CERTIFYING THE STATE OF OHIO'S WITNESS LIST PURSUANT TO CRIM. R. 16.
 "2. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY SENTENCING HIM TO CONSECUTIVE SENTENCES WHERE THE CONVICTIONS DID NOT REQUIRE SEPARATE ANIMUS AND THUS WERE ALLIED OFFENSES REQUIRING CONCURRENT SENTENCES.
 "3. THE TRIAL COURT ERRED IN IMPOSING SEPARATE AND CONSECUTIVE SENTENCES FOR THE FIREARM SPECIFICATIONS ATTACHED TO COUNTS ONE, TWO, AND FIVE.
 "4. THE TRIAL COURT ERRED IN IMPOSING SEPARATE SENTENCES FOR BRANDISHING A FIREARM AND DISCHARGING A FIREARM FROM A MOTOR VEHICLE.
 "5. THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY DENYING HIS MOTION FOR A JUDGMENT OF ACQUITTAL PURSUANT TO CRIM. R. 29.
 "6. THE TRIAL COURT ERRED IN FAILING TO RECOGNIZE THAT A POLICE OFFICER'S SUMMARY OF WHAT A WITNESS TELLS HIM IS A STATEMENT BY THE POLICE OFFICER DISCOVERABLE UNDER THE TERMS OF CRIM. R. 16(B)(1)(g).
 "7. INSOFAR AS ANY ERROR COMPLAINED OF WAS NOT ADEQUATELY PRESERVED BELOW, APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL."
Several of Damon's assignments of error are the same as those presented by appellant Stacy Carter and which therefore have been considered and ruled upon. Damon's first, second, third, fourth, sixth and seventh assignments of error present the same issues addressed under Stacy Carter's second, third, fourth, fifth, first and seventh assignments of error, respectively. Based upon our findings as to Stacy's assignments of error, we find Damon Carter's first, second, third, fourth, sixth and seventh assignments of error not well-taken.
In his fifth assignment of error, Damon asserts that the trial court erred by denying his motion for a judgment of acquittal pursuant to Crim. R. 29. Damon argues that there was testimony that no one in the Carters' car had a firearm and that the test of Damon's hands after his arrest to determine if he had recently fired a gun proved negative. The state asserts that while there may have been exculpatory evidence presented at trial, there also was a significant amount of evidence presented by the state in support of conviction.
It is well-established that "a court shall not order an entry of judgment of acquittal where the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved." State v.Apanovitch (1987), 33 Ohio St.3d 19, 23; State v. Bridgeman
(1978), 55 Ohio St.2d 261. The reviewing court shall consider the evidence in a light most favorable to the appellee. Jackson v.Virginia (1979), 443 U.S. 307.
Upon consideration of all the evidence that was before the trial court and as summarized above, this court finds that, while there was some exculpatory evidence presented at trial, reasonable minds could reach different conclusions as to whether the state had proved beyond a reasonable doubt that appellant did commit felonious assault and aggravated murder. Accordingly, the trial court did not err by denying Damon Carter's motion for acquittal. Damon Carter's fifth assignment of error is not well-taken.
MICHAEL CARTER
Michael Carter sets forth the following assignments of error:
 "FIRST ASSIGNMENT OF ERROR: THE DEFENDANT WAS DENIED DUE PROCESS WHERE THE PROSECUTOR FAILED TO DISCLOSE EVIDENCE AS REQUIRED UNDER CRIM.R. 16(B)(1)(f).
 "SECOND ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED IN PERMITTING THE NON-DISCLOSURE OF THE NAMES AND ADDRESSES OF ALL TWENTY EYE-WITNESSES TO THE CRIME.
 "THIRD ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED IN DENYING MICHAEL CARTER'S REQUESTS FOR A CONTINUANCE FOLLOWING THE TESTIMONY OF THE STATE'S WITNESSES WHO WERE UNDISCLOSED PRIOR TO TRIAL.
 "FOURTH ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED IN FAILING TO GRANT MICHAEL CARTER'S MOTION FOR SEVERANCE OF HIS TRIAL FROM THAT OF DAMON AND STACY CARTER AND TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO RENEW THE MOTION TO SEVER AT THE CONCLUSION OF THE STATE'S CASE.
 "FIFTH ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED IN IMPOSING CONSECUTIVE, RATHER THAN CONCURRENT SENTENCES, FOR THE TWO CONVICTIONS OF FELONIOUS ASSAULT AND THE CONVICTION OF MURDER.
 "SIXTH ASSIGNMENT OF ERROR: THE TRIAL COURT ERRED IN IMPOSING THREE CONSECUTIVE TERMS FOR THE FIREARM SPECIFICATIONS AND THREE CONSECUTIVE TERMS FOR THE DISCHARGE OF A FIREARM FROM A MOTOR VEHICLE SPECIFICATIONS."
Michael's second assignment of error presents the same arguments as those presented by appellant Stacy Carter in his second assignment of error. Based upon our finding as to Stacy Carter's second assignment of error, we find Michael Carter's second assignment of error not well-taken.
Michael's sixth assignment of error presents the same arguments as those presented by Stacy Carter in his fourth and fifth assignments of error. Based upon our finding as to Stacy's fourth and fifth assignments of error as set forth above, we find Michael Carter's sixth assignment of error not well-taken.
In his first assignment of error, Michael Carter asserts that he was denied due process where the state failed to disclose evidence as required under Crim. R. 16(B)(1)(f). Michael argues that the state failed to disclose until several days before trial the following evidence: the existence of at least six 9-1-1 calls that contained exculpatory information, the results of a fingerprint analysis of the green Lumina that showed that none of the defendants' fingerprints were found on the car, and the results of tests done on a shirt worn by Michael Carter on the day of the shooting that showed the absence of any gunpowder residue.
Crim. R. 16(B)(1)(f) states in pertinent part:
 "Upon motion of the defendant before trial the court shall order the prosecuting attorney to disclose to counsel for the defendant all evidence, known or which may become known to the prosecuting attorney, favorable to the defendant and material either to guilt or punishment. * * * "
In State v. Joseph (1995), 73 Ohio St.3d 450, 458, the Supreme Court of Ohio stated that a prosecutorial violation of Crim. R. 16 constitutes reversible error only upon a showing that:
 "(1)the prosecution's failure to disclose was a willful violation of the rule, (2) foreknowledge of the information would have benefited the accused in the preparation of his defense, and (3) the accused suffered some prejudicial effect." [Citations omitted.]
While this court does not condone what appears to have been a lack of diligence on the state's part in providing certain evidence to the defense, the record does not support a finding that the state's actions were a willful violation of the rule, that having the information any sooner would have benefited the accused in preparation of his defense, or that the accused was prejudiced thereby. Defense counsel had access to the information prior to trial and in fact was able to cross-examine witnesses regarding the lack of fingerprints on the car and the absence of gunpowder residue on the shirts. Further, the 9-1-1 tapes were provided to the jury in their entirety, which allowed them to hear all of the calls, including the potentially exculpatory ones. All of the evidence cited by appellant was provided to the defense prior to trial and, therefore, we are unable to find that he was prejudiced by the state's failure to make the evidence available in a more timely fashion. Accordingly, Michael Carter's first assignment of error is not well-taken.
In his third assignment of error, Michael Carter asserts that the trial court erred by denying his requests for a continuance made on the first day of trial and thereafter each time an undisclosed witness testified. Michael argues that he was unable to prepare a proper defense because exculpatory evidence was not revealed until two days before trial and because the state's witness list was certified.
While it is a basic due process right and essential to a fair trial that defense counsel be afforded reasonable opportunity to prepare his case, State v. Sowders (1983), 4 Ohio St.3d 143,144 (citations omitted), the matter of continuance is within the discretion of the trial court. Id. Rather than adopt a mechanical test to determine whether a trial court has abused its discretion in denying a request for continuance, the Supreme Court of Ohio has endorsed a balancing test that weighs potential prejudice to a defendant against concerns such as a court's right to control its own docket and public interest in the prompt and efficient dispatch of justice. Id., citing State v. Unger (1981),67 Ohio St.2d 65, 67.
We note preliminarily that we have already found that the defense was not prejudiced either by the failure to disclose certain evidence until two days before trial (see Michael Carter's first assignment of error) or by the certification of the state's witness list (see Stacy's first and Damon's second assignments of error). Specifically as to defense requests for continuances as to those two issues, the record shows that the trial court took steps to accommodate the defense by informing counsel that they could recall certified witnesses if the defense subsequently acquired information relevant to testimony at trial. To further assist the defense, the trial court authorized an additional $1,500 for an investigator. This court has thoroughly reviewed the entire record of proceedings in the trial court and, upon consideration thereof and the law, we find that the trial court did not abuse its discretion in denying the defense requests for a continuance. Accordingly, appellant Michael Carter's third assignment of error is not well-taken.
In his fourth assignment of error, Michael Carter asserts that the trial court erred by denying his request for severance of his trial from that of Damon and Stacy and that defense counsel was ineffective for failing to renew the motion to sever at the conclusion of the state's case.
As to the first part of Michael's argument, R.C. 2945.13
provides that when two or more persons have been jointly indicted for a noncapital felony, they shall be tried jointly unless, following an application by the prosecutor or one of the defendants showing good cause, the trial court orders separate trials. The burden of showing good cause is upon the party seeking an order for separate trials. State v. Perod (1968),15 Ohio App.2d 115, 119. A motion for relief from prejudicial joinder must be timely raised and renewed at the close of the state's case or at the close of all the evidence. State v. Owens
(1975), 51 Ohio App.2d 132, 146. It appears from the record in this case that while Michael Carter's request for severance was timely raised before trial, it was not properly renewed and therefore could be considered waived for purposes of appeal. Because the initial motion was timely made, however, we will address the merits of this claim.
The joinder of defendants to avoid multiple trials is favored in the law. State v. Thomas (1980), 61 Ohio St.2d 223,225. Joinder is the rule rather than the exception, and the burden is on the defendant to show good cause why a separate trial should be granted. Further, a defendant asserting that joinder is improper must make an affirmative showing that his rights will be prejudiced if a separate trial is not granted. See State v.Roberts (1980), 62 Ohio St.2d 170. A trial court's denial of a motion to sever will not be reversed absent a clear showing of abuse of discretion. State v. Torres (1981), 66 Ohio St.2d 340, syllabus.
Michael claims that there was little evidence that he participated in the criminal activity that gave rise to this case and argues that the jury found him guilty based on the evidence presented against Damon and Stacy. He further claims that if he had been tried separately, the trial court would not have certified the state's witness list since Michael had no criminal record and that his right to receive discovery and properly prepare a defense would not have been impeded.
We have thoroughly reviewed the evidence presented against the defendants in this case. There is no evidence that Michael and the other defendants had incompatible defenses. The evidence put forth by the state clearly placed Michael in the car at the time all of the offenses were committed. Further, we cannot find that if Michael had been tried separately the trial court would not have certified the state's witness list in his trial as well. We therefore find that Michael Carter did not show good cause why joinder was improper and that the trial court's denial of his motion to sever was not unreasonable, arbitrary or unconscionable. This argument is therefore without merit.
Michael Carter further argues in this assignment of error that counsel was ineffective for failing to renew the motion to sever his case pursuant to Crim. R. 14. Crim. R. 14 is a codification of Bruton v. United States (1968), 391 U.S. 123, which requires that if a defendant makes any statement against the interest of a co-defendant, severance for trial is necessary. In this case, however, there were no statements of co-defendants admitted into evidence at trial and none of the three co-defendants testified. Under these circumstances, there would be no reason for the trial court to grant a motion to sever even if it had been made, and therefore there is no prejudice to Michael Carter. The standard to be applied to claims of ineffective assistance of counsel are whether the defendant has shown that: (1) trial counsel's performance was deficient, and (2) counsel's deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. Strickland v. Washington (1984),466 U.S. 668, 687. To prevail on a claim of ineffective assistance of counsel, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. Id. at 689.
Upon consideration of the foregoing, this court finds that, under the facts and circumstances of this case, trial counsel's decisions regarding the timing of a Crim. R. 16 motion to sever involved a tactical choice that was reasonably within the attorney's discretion in the presentation of appellant's defense. See State v. Hester (1976), 45 Ohio St.2d 71. We therefore find that appellant Michael Carter has not demonstrated that he was denied effective assistance of counsel and this argument is without merit.
Accordingly, Michael Carter's fourth assignment of error is not well-taken.
In his fifth assignment of error, Michael Carter asserts that the trial court erred by imposing consecutive rather than concurrent sentences for the two felonious assault and one aggravated murder convictions. Michael argues that the consecutive sentences are not necessary to protect the public from future crime and that the sentences are disproportionate to the seriousness of his conduct and the danger he poses to the public.
R.C. 2929.14(E)(3) provides in relevant part as follows:
 "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
 "(a) The offender committed the multiple offenses while the offender * * * was under post-release control for a prior offense.
 "(b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct."
The record reflects that at the sentencing hearing, the trial court stated that it had balanced the seriousness and recidivism factors under 2929.12 and that it found that the shortest prison term possible would demean the seriousness of the offenses and would not adequately protect the public. The trial court further found that consecutive sentences were necessary to fulfill the purposes of R.C. 2929.11, those being to punish the defendant and protect the public from future crimes by the offender. The trial court also found that the consecutive sentences were not disproportionate to the seriousness of Michael Carter's conduct or to the danger that he poses. Finally, the trial court found that the harm caused by Michael Carter was great and that he was under community control when the offenses were committed. These findings are also reflected in the trial court's judgment entry of sentence.
Based on the foregoing, this court finds that the imposition of consecutive sentences was not contrary to law and Michael Carter's fifth assignment of error is not well-taken.
On consideration whereof, this court finds that substantial justice was done the parties complaining and the judgments of the Lucas County Court of Common Pleas as to Stacy Carter, Damon Carter and Michael Carter are affirmed. Court costs of this appeal are assessed to appellants.
JUDGMENT AFFIRMED.